*1066
 
 OPINION
 

 Per Curiam:
 

 This is an appeal from a jury verdict awarding respondent Faustos Vargas $365,236.00 in damages for breach of an implied contract of continuing employment by appellant Southwest Gas Corporation (Southwest). After investigating complaints of sexual harassment directed against Vargas, Southwest subsequently terminated him. The primary issues on appeal address questions concerning whether there was an implied contract of continuing employment and if so, whether Southwest breached the contract in terminating Vargas.
 

 For reasons hereinafter expressed, we conclude that Southwest is entitled to relief, and therefore reverse.
 

 FACTS
 

 Southwest hired Vargas in 1962 to work in its accounting department. In March 1988, Tina Levell, an employee supervised by Vargas, complained that Vargas was sexually harassing her. In particular, Levell was offended by Vargas touching her whenever she was called into his office: “If I was sitting it was on my legs. If standing he would get a little closer and put his arm around my waist.” She also testified that whenever Vargas came near her and no one else was around, he would put his arm around her waist and drop it to her buttocks. On other occasions, Vargas would come into her cubical, put his arms on her shoulders, kiss her on the cheek and say, “You’re so beautiful I want to whisper sweet things in your ear.” On one occasion Vargas invited Levell for lunch at the top of the Dunes Hotel because he “wanted to spend some time alone” with her.
 

 Levell asked Joy Ray, Southwest’s vice president in charge of accounting, to speak with Vargas about his behavior. Ray referred the matter to Tom Olsen, vice president in charge of human resources, who, after interviewing Levell, determined that a complete investigation was warranted. In accordance with Southwest’s standard procedures, Vargas was suspended with pay during the investigative period.
 

 Olsen began the investigation by directing Ray and Jo Ann
 
 *1067
 
 Thaxton, director of benefits and compensation in the human resources department, to interview all of the women who worked under Vargas’s supervision. It was Southwest’s stated intent to make the investigation as objective and confidential as possible, and a standard questionnaire was therefore used to ensure that all interviewees were asked the same questions. A total of nineteen women, who either worked under Vargas or were referenced during other interviews, were interviewed over a period of two days in April 1988. Some women spoke favorably of Vargas, but others claimed that he had touched, hugged, and kissed them, and had invited them to go away with him, or had otherwise invaded their privacy.
 

 Following the series of interviews, Ray requested written statements from the women who made the most serious accusations against Vargas. The following is a brief summary of some of those accusations.
 

 Laurie Clemmons stated that on her twenty-first birthday, Vargas insisted throughout the day on giving her a birthday hug. When an opportunity arose, he attempted to grab her at which time she told him to leave her alone. Vargas allegedly became angry and told Clemmons not to become defensive. Furthermore, as recounted in Clemmons’s own words,
 

 Vargas always made comments to me such as “you are so good looking[,]” “Hey sweet, let’s run off together to Mexico,” “When you’re thirty, you’ll be so sexy, I’ll have to take you out[.]”
 

 If I was wearing a dress, he would make a point of saying “You look
 
 sooo
 
 good today” (always in a suggestive tone).
 

 Clemmons also recounted that on occasion, “Vargas would come up behind me and squeeze my waist.”
 

 Loretta Bivins stated that Vargas would touch her on the arm or shoulder when speaking to her and that, when he began putting his arm around her waist, she went through a process of moving away from him, physically brushing his arm away, and finally telling him to stop.
 

 Shirley R. Shutt stated that Vargas would often try to flatter her and make comments like, “come here, I need a hug,” and other comments to the effect that he would like to have her alone for just five minutes. Shutt reported, “When he did get ahold of me ... he put his arm around me ... he tried to French kiss me . . . he tried to feel my breasts or put his hand on my back side & feel me. I would literally force him from me and tell him to get out before someone sees him alone in my office.” Shutt reported further that on one occasion she saw Vargas stroking the back side of another female employee’s leg to about eight inches above the knee.
 

 
 *1068
 
 After reviewing the written statements, Ray, Thaxton, and Olsen met with Thomas Trimble, Southwest’s general counsel, and Preston Thompson, a senior member of the accounting department, to discuss the results of the interviews. The next day, Vargas was called in to discuss the findings of the ongoing investigation, the specific complaints of certain women, and to obtain his version of the facts. When Olsen refused to divulge the names of the complaining women, Vargas allegedly stated: “Whoever the people responsible are they are going to hear from me” and “I’d sure like to have their names and I’ll get them no matter what it takes. They’ll hear from me that’s for sure.” Although he denied it at trial, Vargas allegedly confessed during the interview that he had “Carol and Bippy” sit on his knee, that he may have touched someone, and that he had hugged Gail, Terri, and Carol.
 

 After the meeting with Vargas, Olson, Ray, Thompson, and Trimble met to consider options, and outside counsel was consulted. As an alternative to termination, the group considered placing Vargas on probation and assigning him to another work unit, but that option was rejected because of Vargas’s qualifications and because Vargas would still be required to supervise female clerical employees. The group determined that Southwest could not allow Vargas to continue working in the accounting department. In Olsen’s opinion, Vargas had created a hostile working environment, and, considering the threatening manner assumed by Vargas against the women who had complained about his conduct, the group, with the approval of counsel, decided to terminate him.
 

 Upon notification of his termination, Vargas claimed that all of the complaining women were lying and conspiring against him. Southwest CEO Michael Maffie did not believe Vargas’s conspiracy theory was credible and affirmed the decision to terminate.
 

 Vargas thereafter filed suit against Southwest, alleging fourteen separate causes of action. The district court granted summary judgment in favor of Southwest on all claims except the breach of contract claim, which was eventually tried before a jury.
 

 Vargas testified at trial that during his initial employment interview he was guaranteed that if he accepted employment, he could work for an indefinite period and that the company would only terminate his employment for cause after following progressive disciplinary procedures. Vargas presented evidence pertaining to the discipline rendered in five previous incidents at Southwest involving accusations of sexual harassment. Specifically, it was noted that none of the alleged offenders had been terminated. The district judge, however, expressly disallowed any evidence regarding the specific allegations of misconduct in
 
 *1069
 
 the other cases and evidence regarding the investigation processes and the strength and credibility of the witnesses. Furthermore, Vargas testified that two other Southwest employees had been demoted into a “nonfunctional department.”
 

 With respect to termination policy, the following provision was contained in the Southwest employee manual received by Vargas:
 

 A regular employee may only be terminated for cause, termination for cause will occur only after notification from the employee’s supervisor or department head of unsatisfactory performance or violation of a company rule, procedure or practice. The employee will be given an opportunity to correct the cause described by the supervisor or department head,
 
 except in cases where the employee’s conduct constitutes a serious breach of company rules and is cause for immediate termination.
 
 For example:
 

 Insubordination
 
 — Failure to comply with established company rules or to comply with direct orders or instructions given by a member of management.
 

 Dishonesty
 
 — .
 
 . . .
 

 Drugs or Alcohol
 
 — . . . .
 

 Illegal Activity
 
 — Such as conviction of a felony; engaging in criminal act (other than a minor traffic violation); or, an act involving moral turpitude.
 

 Sabotage
 
 — . . . .
 

 Safety
 
 — .
 
 . . .
 

 The foregoing list is representative, but not all-inclusive.
 

 (Emphasis in original.)
 
 [1]
 
 Moreover, Southwest’s rules of general conduct read, in pertinent part:
 

 Failure to adhere generally and substantially to these Rules of General Conduct, or any breach thereof, will be grounds for appropriate disciplinary action. Depending on the severity of the infraction, this may include any or all of the following: verbal reprimand, written reprimand, time off without pay, probation, or termination.
 

 In recognition of the employee’s individual dignity, the company will not tolerate the harassment of individuals with words, signs or gestures related to race, religion or sexual matters.
 

 Finally, Southwest’s statement of disciplinary action provided:
 

 Unsatisfactory performance or violation of a company rule,
 
 *1070
 
 procedure or practice may result in disciplinary action including, but not limited to, any or all. of the following, depending on the seriousness of the circumstances:
 

 Verbal warning
 

 Written warning placed in personnel file Time off without pay
 

 Disciplinary probation delaying any increase in salary that may be due during the probationary period, exempting the employee from certain benefits during the probationary period (such as Employee Appliance Purchase Plan, job bidding, etc.)
 

 These steps serve as formal notice to provide the employee the opportunity to change or correct the problem. Failure to change or correct the problem will result in further action up to and including termination.
 

 A positive change in the specific behavior or problem after a period of time, as specified in the disciplinary action, will result in written notice concerning the correction to the personnel file.
 

 In January 1988 and again in February 1988, all Southwest employees received an updated “Employee Information & Benefits Manual” and “Company Information Manual,” respectively, and were required to sign a disclaimer acknowledging that neither the Employee Information & Benefits Manual nor the Company Information Manual,
 

 nor any other company manual or communication, whatever the source, constitutes an employment contract. No employee, including the chairman of the board and the president, has a contract of employment with the company. Employment is by mutual consent of the company and each individual employee. It can be terminated by the employee at will and by the company according to the applicable policies in effect from time to time.
 

 By my signature appearing below, I acknowledge having read the foregoing introductory statement ....
 

 Apparently, similar disclaimers had been used by Southwest since 1982, and Vargas remembered signing similar disclaimer forms as early as 1984 or 1985. Vargas testified that upon expressing concern about the foregoing disclaimer, Olsen of the Human Resources Department assured him that nothing was changing regarding termination or length of employment, and that he signed the disclaimer in reliance on that oral guarantee.
 

 The jury deliberated and returned a general verdict for Vargas, awarding him $365,236.00 in damages, and judgment was entered accordingly. Southwest appeals the final judgment and
 
 *1071
 
 the district court’s order denying its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.
 

 DISCUSSION
 

 The Employment Contract
 

 All employees in Nevada are presumed to be at-will employees. American Bank Stationery v. Farmer, 106 Nev. 698, 701, 799 P.2d 1100, 1101-02 (1990). An employee may rebut this presumption by proving by a preponderance of the evidence that there was an express or implied contract of employment that provided for termination only for cause.
 
 Id.
 

 Southwest contends that Vargas failed to rebut the at-will presumption at trial. We disagree. In view of the provision in the employee’s manual stating that “[a] regular employee may only be terminated for cause,” coupled with Vargas’s testimony that Southwest orally guaranteed him long-term employment, the jury’s finding that Vargas had a long-term contractual relationship with Southwest is supported by substantial evidence.
 
 See American Bank Stationery,
 
 106 Nev. at 702, 799 P.2d at 1102 (handbook declaring that employees could be discharged only for cause was written evidence of express oral contract). Moreover, Southwest’s assertion that the disclaimers signed by Vargas in January and February 1988 effected a modification of the employment contract as a matter of law is without merit.
 

 In D’Angelo v. Gardner, 107 Nev. 704, 819 P.2d 206 (1991), we acknowledged the potential impact of an appropriately worded disclaimer:
 

 Of course, the employer can easily prevent [the inference that a handbook is part of the employment contract] from arising by including in its handbook an express disclaimer of implied contractual liability of the type found in Perry v. Sears, Roebuck & Co., 508 So. 2d 1086, 1088 (Miss. 1987). In
 
 Perry,
 
 the pension plan manual at issue stated in bold type, “Employment rights not implied,” and further stated that “Participation in the plan does not . . . interfere in any way with the right of the company to discharge or terminate you at any time.” In light of these statements, the court correctly found that no inference of implied contractual liability was present; thus, the court held that summary judgment was proper.
 

 Id.
 
 at 708 n.4, 819 P.2d at 209 n.4.
 

 Moreover, given the degree of murkiness involved in termina
 
 *1072
 
 tion cases involving rights assertedly arising from employee handbooks, it is perhaps helpful to note that case authority allows for determinations by triers of fact where such handbooks contain an element of relevant ambiguity. Thus, it has been held that:
 

 “the disclaimer is merely one factor to consider in ascertaining whether the handbook as a whole conveys credible promises that should be enforced. . . . The disclaimer, which necessarily militates against enforcement, should be weighed in the balance along with other handbook provisions. . . . [A] handbook that contains both promissory language and a disclaimer should be viewed as inherently ambiguous. Thus, . . . the entire handbook, including any disclaimer, should be considered in determining whether the handbook gives rise to a promise, an expectation and a benefit.
 

 “As with any question of fact, this is primarily a matter for the jury to decide. The court should intervene to resolve the handbook issue as a matter of law only if the handbook statements and the disclaimer, taken together, establish beyond any doubt thaft] an enforceable promise either does or does not exist.”
 

 Fleming v. Borden, Inc., 450 S.E.2d 589, 596 (S.C. 1994) (quoting Stephen F. Befort,
 
 Employee Handbooks and the Legal Effect of Disclaimers,
 
 13 Indus. Rel. L.J. 326, 375-76 (1991-92)).
 

 Although the disclaimers at issue preserved an employee’s right to terminate his or her employment at will, they subjected Southwest’s stated policy regarding employee termination to the “applicable policies in effect from time to time.” In light of this limitation, the handbook policy providing that Southwest employees may only be terminated for cause, and the language in the disclaimer providing that no employee at Southwest has a contract of employment, created an ambiguity that precluded judgment in Southwest’s favor on that point as a matter of law.
 

 It appears implicit from the record that following our holding in Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983), Southwest attempted to protect itself from future contractual liability to its employees in situations involving termination. Nevertheless, rather than issuing a clear disclaimer comparable to that in
 
 Perry
 
 (alluded to in
 
 D’Angelo),
 
 Southwest apparently elected to preserve its for-cause termination policy in its Company Information Manual.
 

 An unfortunate and potentially troublesome predicament arises when an employer, desiring to diminish its potential exposure to contractual liability, also seeks to retain policy statements condu
 
 *1073
 
 cive to employee morale and productivity engendered by expressions of job security. We nevertheless conclude that an ambiguous disclaimer of the type issued to its employees by Southwest is insufficient, as a matter of law, to vitiate evidence of a for-cause employment contract of the nature and quality present here.
 

 Having concluded that substantial evidence supported the jury’s finding of an employment contract between Vargas and Southwest, we now turn to the issue of whether his discharge constituted a breach of Vargas’s right to be terminated only for cause.
 

 The Alleged Breach of Contract
 

 Vargas alleges a breach of his employment contract based upon two theories: (1) that the alleged misconduct for which he was terminated did not amount to good cause; and (2) that Southwest wrongfully failed to apply progressive discipline procedures prior to his termination.
 

 In resolving the first argument posited in support of a contractual breach, it is essential to address the role of the trier of fact in determining whether an employer’s stated reasons for terminating an employee with a long-term employment contract amount to good cause. The parties appear to agree on the applicable standard. Both maintain that Vargas had the burden of proving by a preponderance of the evidence that Southwest did not have a legitimate business reason for firing him. The issue, in other words, is whether Southwest “reasonably believed” that Vargas had sexually harassed other employees.
 

 Southwest contends that Vargas raised no genuine issue of material fact with respect to the reasonableness of its belief that he had engaged in sexual harassment. Vargas counters that since the jury heard and rejected the testimony of Southwest’s employees who claimed to have been harassed by Vargas, the jury properly found that Southwest could not have reasonably believed that Vargas had engaged in sexual harassment.
 

 In view of the mutually agreeable jury instruction on this issue,
 
 [2]
 
 there is no apparent controversy as to the applicable rule
 
 *1074
 
 of law. However, despite Vargas’s superficial agreement with the “reasonable belief” standard, his arguments on appeal interpreting that standard tend to advocate a rule that would allow for de novo factual review of the issue of good cause by a jury. In order to fully and fairly resolve the legal dispute between Southwest and Vargas, we must address the legal rule contained in the instruction.
 

 
 *1073
 
 Termination for cause means a legitimate reason for making a decision to discharge an employee. An employer is entitled to assess and determine the quality and acceptability of the employee’s performance and conduct and to rely upon facts the employer reasonably believes to be true regarding the employee’s behavior.
 

 A legitimate business reason is one rationally related to a lawful business purpose. Termination of an employee for a legitimate business reason is not a breach of a promise to terminate only for cause. The
 
 *1074
 
 plaintiff must prove by a preponderance of the evidence the defendant did not have a legitimate business reason for discharging him.
 

 It is not appropriate for you to substitute your opinion for that of the employer that plaintiff’s conduct was not satisfactory. Your task is to decide whether the decision to terminate the plaintiff was made for legitimate reasons.
 

 We begin our analysis with Simpson v. Western Graphics Corp., 643 P.2d 1276 (Or. 1982), an opinion by the Oregon Supreme Court that qualified Yartzoff v. Democrat-Herald Publishing Co., 567 P.2d 356 (Or. 1978), the primary authority upon which this court relied in recognizing the prospect of an implied contract of continuing employment in Nevada.
 
 See
 
 Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 595, 668 P.2d 261, 261 (1983). In
 
 Simpson,
 
 Western Graphics Corp. accused two employees of threatening violence against a co-employee and later terminated them. The two employees subsequently filed suit, alleging breach of their contract of continuing employment, and, in opposition to Western Graphics Corp.’s motion for summary judgment, contended that the trier of fact should be allowed to determine whether they committed the act upon which their termination was based. Summary judgment was entered in favor of Western Graphics Corp., and the Oregon Supreme Court affirmed with the following ruling:
 

 Although an employer’s statement of employment policy has a degree of contractual effect,
 
 see Yartzoff v. Democrat-Herald. Publishing Co.,
 
 .... [i]n the absence of any evidence of express or implied agreement whereby the employer contracted away its fact-finding prerogative to some other arbiter, we shall not infer it.
 

 . . . Here, ... the employer agreed to the substantive standard embodied in the term “just cause,” but did not agree to a secondary level of fact-finding authority.
 

 Id.
 
 at 1279.
 

 In comparatively recent years, Oregon and many other jurisdictions including Nevada, have crafted exceptions to the common law at-will doctrine in order to give contractual effect to company termination policies upon which employees rely. Unfortunately, such exceptions have spawned the additional task of
 
 *1075
 
 defining the extent to which employees should be afforded traditional contract rights in connection with that reliance.
 

 There are obvious policy concerns implicated in treating an employment contract implied from an employee manual in the same manner as a negotiated contract. For example, allowing a jury to trump the factual findings of an employer that an employee has engaged in misconduct rising to the level of “good cause” for discharge, made in good faith and in pursuit of legitimate business objectives, is a highly undesirable prospect. In effect, such a system would create the equivalent of a preeminent fact-finding board unconnected to the challenged employer, that would have the ultimate right to determine anew whether the employer’s decision to terminate an employee was based upon an accurate finding of misconduct, and whether any such misconduct was qualitatively and quantitatively sufficient to constitute good cause for discharge. This ex officio “fact-finding board,” unattuned to the practical aspects of employee suitability over which it would exercise consummate power, and unexposed to the entrepreneurial risks that form a significant basis of every state’s economy, would be empowered to impose substantial monetary consequences on employers whose employee termination decisions are found wanting.
 

 On the other hand, in the absence of an unequivocal at-will termination, an employer’s discretion to declare the presence of good cause for termination cannot be immune to challenge; otherwise, an employee’s contractual entitlements to continuing employment would be without substance or effect.
 

 We believe that a qualified
 
 Simpson
 
 approach strikes the proper balance between a recognition of the legitimate business judgment of employers and the contractual rights of employees impliedly or expressly grounded in employee handbooks and other forms of evidence of continuing employment. Therefore, absent substantial evidence of an express or implied agreement contracting away its fact-finding prerogatives to some other arbiter, the employer is the ultimate finder of facts constituting good cause for termination. We emphasize, however, that the employer’s decision to terminate must be consistent with its contractual prerogatives; the employment contract may subject an employer’s termination authority to relevant policy provisions defining or limiting the term “good cause,” or to defined procedures that the employer must follow prior to termination.
 
 See
 
 K Mart Corp. v. Ponsock, 103 Nev. 39, 42, 732 P.2d 1364, 1366 (1987) (employer that summarily fired employee for alleged good cause breached contract stating that if there were any deficiencies in employee’s performance, employer would provide assistance and
 
 *1076
 
 would release employee only after a series of correction notices and a determination that the performance remained unacceptable); Rulon-Miller v. Intern. Bus. Mach. Corp., 208 Cal. Rptr. 524, 531-32 (Ct. App. 1984) (employee wrongfully terminated for romantic involvement with manager of rival firm where “the right to be free of inquiries concerning her personal life was based on substantive direct contract rights she had flowing to her from [company] policies”).
 

 Moreover, we reaffirm our implicit prior rulings expressly enunciated in the case law of many other jurisdictions, that employers are obligated to act in good faith and upon a reasonable belief that good cause for terminating a for-cause employee exists. Genuine issues of material fact casting a strong doubt on the purported good-faith of the employer are ripe for a jury’s consideration.
 

 On past occasions, for example, we have affirmed judgments in cases similar to the one now before us, wherein an implied contract for continuing employment has been proved to the satisfaction of the trier of fact by a preponderance of the evidence. In doing so, we have deferred to jury findings that employers, in breach of contract, have terminated employees for reasons not rising to the level of “good cause.” In one case, the record disclosed evidence that an employer saved a substantial amount of money by terminating an employee (employee forced to withdraw retirement funds at a loss, and replacement employee paid significantly lower salary), and we held that “ample evidence was presented from which the jury could conclude that . . . Beales was terminated for reasons other than those specifically stated.” Beales v. Hillhaven, Inc., 108 Nev. 96, 103, 825 P.2d 212, 216 (1992). In another case, the record contained evidence that a supervisor entertained personal animosity for an otherwise dedicated employee, and we perceived no basis on which to set aside the jury’s finding that good cause for the employee’s termination was not present. American Bank Stationery v. Farmer, 106 Nev. 698, 700, 799 P.2d 1100, 1101 (1990).
 

 Several jurisdictions have adopted the standard that is implicit in our prior holdings. In Braun v. Alaska Com. Fishing & Agr. Bank, 816 P.2d 140 (Alaska 1991), a bank’s chief lender and the state government, concerned with the bank’s financial stability, placed pressure on the bank to become more frugal. The bank’s approach included increasing the loan volume handled by each loan officer, and Braun, a loan officer, was terminated as a consequence of the reorganization. Braun sued the bank for breach of employment contract, and the superior court granted summary judgment in favor of the bank, concluding that economic necessity constituted good cause for Braun’s termination. On appeal, Alaska’s high court held that ‘“a discharge for “just
 
 *1077
 
 cause” is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true.’”
 
 Id.
 
 at 142 (quoting Baldwin v. Sisters of Providence in Washington, Inc., 769 P.2d 298, 304 (Wash. 1989)). The court concluded that, assuming the existence of an employment contract terminable only for cause, “[t]he record shows that no genuine issue of material fact existed as to the Bank’s economic motivation for Braun’s termination, or its belief that such eco-' nomic need existed.”
 
 Id.
 
 Good cause was therefore present on the record as a matter of law.
 

 Baldwin
 
 (quoted in Braun) is even more apropos, because it dealt with employee misconduct, the occurrence of which was in dispute. In
 
 Baldwin,
 
 a respiratory therapist at a hospital was terminated following alleged sexual abuse of a patient and an investigation into the charges. The therapist prevailed at trial on a breach of employment contract claim, but on appeal to the Supreme Court of Washington, the judgment was- reversed:
 

 In this case, the parties agree sexual abuse of a patient is just cause for termination. An instruction was given to this effect. Therefore, the only issue is who makes the requisite factual determination of just cause. This question has not been decided by this court.
 

 . . . [A]n employer’s agreement to restrict discharges to those supported by just cause should not be followed by a further judicial implication which takes the determination of just cause away from the employer. . . .
 

 The reasoning of the Oregon Supreme Court [in Simpson] is persuasive. The employer unilaterally decided to place the restriction of just cause upon its termination decisions. This just cause provision, by its terms, had no restrictions. . . .
 
 As defendants argue, a standard which checks the subjective good faith of the employer with an objective reasonable belief standard strikes a balance between the employer’s interest in making needed personnel decisions and the employee’s interest in continued employment. See
 
 [Thompson v. St. Regis Paper Co., 685 P.2d 1081 (1984)
 
 [3]
 
 ]. A contrary result could encourage employers to remove such provisions from their handbooks and render the inroads made by
 
 Thompson
 
 ineffectual.
 

 
 *1078
 

 Baldwin,
 
 769 P.2d at 303-04 (emphasis supplied).
 

 In agreement with the standard as set forth in
 
 Baldwin
 
 and
 
 Braun,
 
 we hold that a discharge for “just” or “good” cause is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence, and (2) reasonably believed by the employer to be true.
 
 [4]
 
 Of course, unsubstantiated and clearly baseless allegations of fact against the employer may not be sufficient to overcome summary judgment; however, in the face of adequate averments of fact tending to show a lack of good faith, a conspicuous absence of substantial evidence in support of a reasonable belief in the presence of good cause, or a demonstrably capricious “cause” for termination, a genuine and material issue for trial remains.
 

 In the present case, Southwest conducted extensive interviews and acquired written statements from those who incriminated Vargas, which ultimately culminated in the advice by in-house and independent counsel to terminate Vargas. Southwest took manifestly sufficient measures to form a reasonable and enlightened belief concerning the accuracy of the complaints against Vargas and the need to terminate his services.
 

 Moreover, Vargas offered insufficient evidence to create a genuine issue of material fact as to the reasonableness of South
 
 *1079
 
 west’s belief in the accusations against him or as to any possible pretextual motive for his discharge. The only testimony relating to that category established that two other employees had been demoted to a “nonfunctional department,” the clear implication being that Vargas was being discriminated against in some way. That evidence, however, sheds no probative light on Southwest’s motives with respect to Vargas. In short, Vargas presented no evidence from which the jury could reasonably infer that Southwest’s decision to terminate him was not made in good faith, and Southwest presented substantial evidence of the bona fides of its decision.
 
 [5]
 

 Finally, Vargas contends that even if good cause existed for his termination, his discharge violated the terms of his employment contract, as defined by company policy. Specifically, Vargas contends that Southwest’s failure to apply a progressive disciplinary policy in his case constituted a breach of contract. We disagree.
 

 According to Southwest’s policy as expressed within its employee manuals, the propriety of an immediate termination depends on the seriousness of the conduct. Moreover, sexual harassment was acknowledged by Olsen as an offense that could result in immediate termination, and Maffie expressed his opinion that Vargas’s conduct fell within two of the categories outlining grounds for immediate termination. Vargas presented evidence that immediate termination did not result in five other cases of sexual harassment at Southwest, but, as Southwest notes, the district court excluded foundational facts from the other cases, including the specific allegations of misconduct and the strength and credibility of the witnesses. Southwest contends that without
 
 *1080
 
 the foundational facts, the admitted testimony was irrelevant, confusing and unduly prejudicial.
 

 It is arguable that if Vargas had presented evidence demonstrating that each of the other five cases were qualitatively and quantitatively indistinguishable from his case, such evidence may have supplied the jury with a basis for inferring that his termination was not made in good faith, and that Southwest’s motives, were pretextual. Such, however, was not the case. The only evidence offered to support such an inference was the fact that Southwest treated Vargas differently than past employees accused of sexual harassment. That evidence, however, without foundational support, was irrelevant and highly prejudicial.
 
 [6]
 
 Southwest has plainly reserved the right of immediate termination in serious cases of misconduct and has not ceded to a jury the authority to define the term “serious misconduct.” Condoning the jury’s implicit determination that a progressive discipline policy, as a matter of contract, is guaranteed to all Southwest employees would ignore the plain language of Southwest’s policy statements, as well as the lack of evidence suggesting disparate treatment in Vargas’s case.
 
 [7]
 

 Other issues raised by Southwest have arguable merit. In light of this opinion, however, we need not address them.
 

 CONCLUSION
 

 For the foregoing reasons, we conclude that the district court erred in denying Southwest’s motion for judgment notwithstanding the verdict. Accordingly, we reverse the judgment of the district court entered pursuant to the jury’s verdict.
 

 [1]
 

 At trial, Olsen acknowledged that sexual harassment was an offense that could result in immediate termination, and CEO Maffie testified that Vargas’s conduct fell within the categories of insubordination and illegal conduct.
 

 [2]
 

 On the issue of “good cause” for termination, the jury was instructed as follows, with the apparent acquiescence of each party:
 

 [3]
 

 Thompson
 
 is the Washington case that modified the common law at-will doctrine to provide protection for employees who rely on employer promises of specific treatment in employee manuals and who are discharged for reasons contravening public policy.
 

 [4]
 

 We acknowledge that some courts have taken a more deferential approach. For example, the Michigan Supreme Court has stated that allegations of misconduct present a question of fact for the jury, not only in terms of whether the misconduct occurred, but also in terms of whether the misconduct constitutes good cause. Toussaint v. Blue Cross & Blue Shield of Mich., 292 N.W.2d 880, 896 (Mich. 1980). This is true despite “the danger that [the jury] will substitute its judgment for the employer’s. If the jurors would not have fired the employee for doing what he admittedly did, or they find he did, the employer may be held liable in damages although the employee was discharged in good faith and the employer’s decision was not unreasonable.”
 
 Id.
 
 Moreover, the California Supreme Court has expressed agreement with the proposition that although an employer has wide latitude in making personnel decisions,
 

 an employer’s belief is not a substitute for good cause. For that reason, the employer’s broad latitude does not extend to being
 
 factually
 
 incorrect. If an employer claims the employee was discharged for specific misconduct, and the employee denies the charge, the question of whether the misconduct occurred is one of fact for the jury.
 

 Wilkerson v. Wells Fargo Bank, 261 Cal. Rptr. 185, 192-93 (Ct. App. 1989) (cited by the California Supreme Court with approval in LaGoe v. Duber Indus. Sec. Inc., 782 P.2d 1140 (Cal. 1989),
 
 vacating
 
 LaGoe v. Duber Indus. Sec. Inc., 239 Cal. Rptr. 445 (Ct. App. 1987)).
 
 But see
 
 Desuasido v. Sanwa Bank California, 278 Cal. Rptr. 868 (Ct. App. 1991),
 
 review denied,
 
 June 6, 1991; Moore v. May Dept. Stores Co., 271 Cal. Rptr. 841, 843 (Ct. App. 1990).
 

 [5]
 

 We note that charges of sexual harassment present significant problems to employers, not only in terms of their contractual relationship with their employees, but in terms of federal law under Title VII of the Civil Rights Act.
 
 See
 
 42 U.S.C. §§ 2000e-2000e-17. Allowing a jury to second guess an employer’s good-faith determination that sexual harassment has occurred would thrust employers into an extremely difficult, Catch-22 predicament.
 

 In one notable case decided by the Tenth Circuit Court of Appeals, an employer discharged an employee known to be guilty of sexual harassment six months after the complainant’s first reports of misconduct. The court held that the employer had failed to promptly remedy the hostile environment, and was thus liable to the employee under Title VII. Baker v. Weyerhaeuser Co., 903 F.2d 1342, 1345 (10th Cir. 1990).
 
 Baker
 
 and similar cases compel employers to take accusations of sexual harassment very seriously. Public policy therefore requires that employers be given broad discretion to determine what types of speech and conduct fall within the prohibited category of sexual harassment when determining whether to terminate an employee, and such determinations are entitled to deference when the discharged employee seeks to recover for breach of an implied contract. Williams v. Maremont Corp., 875 F.2d 1476, 1485 (10th Cir. 1989).
 

 [6]
 

 A “hostile environment” Title VII claim generally requires evidence of a pattern of offensive conduct; single or isolated incidents will not suffice.
 
 See
 
 Moylan v. Maries County, 792 F.2d 746, 749-50 (8th Cir. 1986). An employer privy to the nuances of Title VII would certainly be sensitive to the precise facts of each case of sexual harassment in determining appropriate remedies. In addition, Vargas’s counsel stated during oral argument that the five prior cases of sexual harassment occurred between 1982 and 1985. There were substantial changes in the degree of seriousness with which society and the law viewed sexual harassment'in the workplace subsequent to the time of the earlier cases at Southwest. This alone would justify a more severe response to the sexual harassment involved in the instant case.
 
 See supra
 
 note 4.
 

 [7]
 

 We again note the extreme tension placed on an employer under the circumstances of this case. If Southwest had transferred Vargas to another department, or given him a series of warnings prior to termination, and the “atmosphere of hostility” thus prolonged, the $365,236.00 judgment entered against Southwest in favor of Vargas may have indeed been awarded to one or more other Southwest employees who were unnecessarily exposed to an extended sexual harassment by Vargas. If such conditions were countenanced under any principle of law, employers would virtually be driven to take all necessary steps to see that all employees were clearly placed in an at-will category.