[No. S057098. Jan. 5, 1998.]

RALPH COTRAN, Plaintiff and Respondent, v.
ROLLINS HUDIG HALL INTERNATIONAL, INC., et al., Defendants
and Appellants.

COUNSEL

Shand S. Stephens, Margaret L. Parker, Littler, Mendelson, Fastiff, Tichy & Mathiason, Henry D. Lederman, Steven B. Berlin, Mark E. Robson and Robert T. Landau for Defendants and Appellants.

Paul N. Halvonik, Fred J. Hiestand, Orrick, Herrington & Sutcliffe, Gary R. Siniscalco, Douglas D. Mandell, Nancy M. Lee, Paul, Hastings, Janofsky & Walker, Paul W. Cane, Jr., Alfred Sanchez, Jr., Rushfeldt, Shelley & Drake, Linda C. Miller and Christine T. Hoeffner as Amici Curiae on behalf of Defendants and Appellants.

Thomas Kallay, Robert H. Pourvali, Richard Knickerbocker, Anderson & Bennett and Gail S. Cooper-Folb for Plaintiff and Respondent.

Ajalat & Ajalat, Sol P. Ajalat, Stephen P. Ajalat, Quackenbush & Quackenbush and William C. Quackenbush as Amici Curiae on behalf. of Plaintiff and Respondent.

Judith E. Kurtz and Patricia A. Shiu as Amici Curiae.

OPINION

**BROWN, J.**—When an employee hired under an *implied* agreement not to be dismissed except for "good cause" is fired for misconduct and challenges the termination in court, what is the role of the jury in deciding whether misconduct occurred? Does it decide whether the acts that led to the decision to terminate happened? Or is its role to decide whether the employer had reasonable grounds for *believing* they happened and otherwise acted fairly? The Courts of Appeal are divided over the question. The majority of California decisions suggest the jury's role is to decide whether the employer concluded misconduct occurred "fairly, honestly, and in good faith." That standard, or variations on it, appears to be the rule in most other jurisdictions as well. But at least one Court of Appeal opinion adopts a more expansive view. It holds the jury must decide whether the alleged misconduct occurred as a *matter of fact*, and places the burden of proving it on the employer.

We granted review to clarify the role of the jury in litigation alleging breach of an implied contract not to terminate employment except for good or just cause, and to resolve the conflict among the Courts of Appeal. The better reasoned view, we conclude, prescribes the jury's role as deciding

whether the employer acted with " 'a fair and honest cause or reason, regulated by good faith.' " That language is from *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917] (*Pugh I*), the font of implied-contract-based wrongful termination law in California. Recently, in *Scott* v. *Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 467 [46 Cal.Rptr.2d 427, 904 P.2d 834] (*Scott*), we elaborated on the content of good or just cause by enumerating what it is *not*: reasons that are " 'trivial, capricious, unrelated to business needs or goals, or pretextual.' " (Quoting *Wood* v. *Loyola Marymount University* (1990) 218 Cal.App.3d 661, 670 [267 Cal.Rptr. 230].)

Today, we expressly adopt a governing standard that combines the formulations in both *Scott, supra*, 11 Cal.4th at page 467, and *Pugh I, supra*, 116 Cal.App.3d at page 330 (the *Scott-Pugh* standard), elaborating on its meaning and how it should be administered by trial judges to promote the policies underlying implied-contract-based wrongful discharge claims involving employee misconduct.[1] And because the Court of Appeal relied on a substantially similar standard in overturning a jury verdict in favor of the plaintiff-employee in this case and ordering a new trial, we affirm its judgment as well. We disapprove *Wilkerson* v. *Wells Fargo Bank* (1989) 212 Cal.App.3d 1217 [261 Cal.Rptr. 185], the only published Court of Appeal decision adopting a broader view of the jury's function in this species of wrongful discharge litigation.

## I. *Facts and Procedural Background; Rollins's Investigation and the Decision to Terminate Plaintiff*

In 1987, Rollins Hudig Hall International, Inc. (Rollins), an insurance brokerage firm, approached plaintiff, then a vice-president of a competitor, with a proposal to head its new West Coast international office. Following a series of telephone conferences, meetings and exchanges of letters, plaintiff joined Rollins in January 1988 as senior vice-president and western regional international manager. He held that position until 1993 when he was fired.

The events leading to plaintiff's termination began in March 1993, when an employee in Rollins's international department reported to Deborah

---

[1]In this case, the contractual limitation on the employer's at-will power of termination is implied, arising, as the trial judge apparently determined, from preliminary negotiations and the text of a letter defendants sent plaintiff in response to a request for additional assurances of "permanent employment" before accepting their employment offer. The letter stated that if plaintiff's efforts to develop an international brokerage department failed to succeed, "other opportunities" within the organization would be "made available" to him. The Court of Appeal held it was error for the trial court to take from the jury the issue whether there was an implied contract not to terminate plaintiff except for good cause, a holding we do not review. (See *post*, at p. 109.) Wrongful termination claims founded on an *explicit* promise that termination will not occur except for just or good cause may call for a different standard, depending on the precise terms of the contract provision.

Redmond, the firm's director of human resources, that plaintiff was sexually harassing two other employees, Carrie Dolce and Shari Pickett. On March 24, Redmond called both women to her office. In separate interviews, she asked each if they had been harassed. Both said yes; each accused plaintiff as the harasser. Two days later, both women furnished statements to Redmond stating that plaintiff had exposed himself and masturbated in their presence more than once; both also accused plaintiff of making repeated obscene telephone calls to them at home. Redmond sent copies of these statements to Rollins's equal employment opportunity (EEO) office in Chicago. Rollins's president, Fred Feldman, also was given copies. He arranged for a meeting with plaintiff at Rollins's Chicago office, attended by Robert Hurvitz, the firm's head of EEO, and Susan Held, Rollins's manager for EEO compliance. At the meeting, Feldman reviewed the accusations made by Dolce and Pickett against plaintiff. He explained that an investigation would ensue and that its outcome would turn on credibility. After reading the Dolce and Pickett statements to plaintiff, Held explained how the investigation would proceed. Plaintiff said nothing during the meeting about having had consensual relations with either of his two accusers, and offered no explanation for the complaints.

Pending completion of the EEO investigation, Rollins suspended plaintiff. Over the next two weeks, Held interviewed 21 people who had worked with plaintiff, including 5 he had asked her to interview. Held concluded that both Dolce and Pickett, who reiterated the incidents described in their statements, appeared credible. Her investigation failed to turn up anyone else who accused plaintiff of harassing them while at Rollins. One Rollins account executive, Gail Morris, told Held that plaintiff had made obscene telephone calls to her when they both worked for another company, soon after a sexual relationship between the two had ended. Susan Randall, one of those plaintiff had asked to be interviewed and who had described plaintiff as a "perfect gentleman," later called Held to relate "a strange early morning phone call" from plaintiff which "was not for any business purpose." Randall "couldn't figure out what [plaintiff] wanted, . . . yelled at him, told him to leave her alone, and never to call her in the middle of the night again." Held's investigation also confirmed that plaintiff had telephoned Dolce and Pickett at home. In April, both women signed sworn affidavits reciting in detail the charges made against plaintiff in their original statements.

On the basis of her investigation, her assessment of Dolce's and Pickett's credibility, and the fact that no one she interviewed had said it was "impossible" to believe plaintiff had committed the alleged sexual harassment, Held concluded it was more likely than not the harassment had occurred. She met with Feldman and Hurvitz to present her conclusions and gave Feldman

copies of the affidavits of Dolce, Pickett, and Gail Morris. After reviewing Held's investigative report and the affidavits, Feldman fired plaintiff on April 23, 1993. This suit followed.

## II. *The Trial*

### A. *Plaintiff's Case; the Defense*

At trial, plaintiff testified he met Dolce in December 1990 when she was employed temporarily at Rollins. After she left, Dolce telephoned plaintiff and suggested they meet socially. The two had lunch several times. Dolce asked plaintiff for a job as a temporary secretary in his department. Plaintiff agreed. Dolce began work at the end of February 1991, becoming a permanent employee in April. In May, plaintiff testified, he and Dolce began an intermittent affair that continued through February 1993. They had sex between six and ten times, including three times at a hotel room plaintiff had reserved for their lunch hour; he produced credit card receipts from the hotel for rooms rented during that period.

As for Pickett, plaintiff testified they had a brief affair from January to April 1992. Plaintiff's mother testified she saw Pickett at her son's house and leave with him a short time later. He was carrying bedding, she testified, and returned two hours later, explaining he had been to his unfurnished condominium nearby. This incident, plaintiff testified, was the first time he and Pickett had sex. Plaintiff's tae kwon do trainer testified he met Pickett at plaintiff's house in February 1992. According to plaintiff, he and Pickett had sex on several occasions before their relationship ended. He began a sexual relationship with his wife-to-be in June 1992. She moved in with him in July, and they were married in October. During this time, plaintiff continued his sexual liaison with Dolce, but not with Pickett. He had not disclosed these liaisons during the Chicago interview with Feldman because he was upset, "frightened," and felt "ambushed." Plaintiff presented additional evidence through several witnesses suggesting Dolce had been "flirtatious" in front of others, that both she and Pickett were angry because he had been "two-timing" them, and that Dolce's real motive was to force plaintiff to grant her a substantial raise in pay. Indeed, more than one of plaintiff's witnesses testified that on the same day plaintiff met in Chicago with Feldman and other Rollins executives to discuss the allegations against him, Dolce faxed him a proposal seeking a substantial pay increase.

Rollins called Dolce as a witness. She testified in detail about the masturbation incidents at the office and in plaintiff's car, and the obscene telephone calls described in her affidavit. In the fall of 1992, Dolce testified, she

discovered plaintiff had been "doing exactly the same thing[s]" to Pickett. She never had sex with plaintiff, never went to his house, was never with him in a hotel room. Pickett testified to the similar incidents described in her affidavit; she denied ever having sex with plaintiff. Employees involved in Rollins's EEO investigation also testified. Rollins's president, Feldman, testified that in addition to the affidavits of Dolce and Pickett, he relied on Gail Morris's affidavit in deciding to discharge plaintiff. Over Rollins's objection, the trial court ruled Gail Morris's affidavit hearsay and inadmissible.

### B. *The Jury Instructions and Verdict*

Rollins defended its decision to fire plaintiff on the ground that it had been reached honestly and in good faith, not that Rollins was required to prove the acts of sexual harassment occurred. Plaintiff objected to Rollins's defense theory, and the trial court rejected it as not available in a breach of contract action, the only one of plaintiff's claims to go to the jury. Boiled down, the trial judge remarked, the case was nothing more than "a contract dispute" and it was Rollins's burden to *prove* plaintiff committed the acts that led to his dismissal; "whether [Rollins] in good faith believed [plaintiff] did it is not at issue." The trial court told the jury: "What is at issue is whether the claimed acts took place . . . . The issue for the jury to determine is whether the acts are in fact true . . . . Those are issues that the jury has to determine." The trial court also read the jury BAJI No. 10.13, the standard instruction defining "good cause" in employment discharge litigation.[2] It refused an instruction requested by Rollins directing the jury not to substitute its opinion for the employer's.

The jury returned a special verdict. Asked whether plaintiff "engaged in any of the behavior on which [Rollins] based its decision to terminate plaintiff's employment," it answered "no." It set the present cash value of plaintiff's lost compensation at $1.78 million. Rollins appealed from the judgment entered on the verdict. The Court of Appeal reversed. ▉ We granted review to clarify the standard juries apply in wrongful termination litigation to evaluate an employer's "good cause" defense based on employee misconduct. We decide, in other words, the question the jury answers when the discharged employee denies committing the acts that provoked the decision to terminate employment. The question of the jury's role in resolving the related but separate issue of whether the reasons assigned by an

---

[2]BAJI No. 10.13 states: "Where there is an employment agreement not to terminate an employee except for good cause, an employer may not terminate the employment of an employee unless such termination is based on a fair and honest cause or reason. In determining whether there was good cause, you must balance the employer's interest in operating the business efficiently and profitably with the interest of the employee in maintaining employment."

employer for termination are legally sufficient to constitute good cause is one we leave for another case.

## III. *Discussion*

### A. *The Law*

We begin at the beginning. ■ The Court of Appeal opinion in *Pugh I, supra,* 116 Cal.App.3d 311, recognized that "[t]he terms 'just cause' and 'good cause,' . . . . [Citation.] . . . connote 'a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.' " (*Id.* at p. 330, quoting *R. J. Cardinal Co.* v. *Ritchie* (1963) 218 Cal.App.2d 124, 144, 145 [32 Cal.Rptr. 545].) "Care must be taken, however," the *Pugh I* opinion continued, "not to interfere with the legitimate exercise of managerial discretion. . . . [Citation.] And where . . . the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment." (116 Cal.App.3d at p. 330, fn. omitted.)

In *Walker* v. *Blue Cross of California* (1992) 4 Cal.App.4th 985 [6 Cal.Rptr.2d 184], the court described "good cause" as "relative. Whether good cause exists is dependent upon the particular circumstances of each case. [Citation.] [¶] In deciding whether good cause exists, there must be a balance between the employer's interest in operating its business efficiently and profitably and the employee's interest in continued employment. [Citations.] Care must be exercised so as not to interfere with the employer's legitimate exercise of managerial discretion. [Citation.] While the scope of such discretion is substantial, it is not unrestricted." (*Id.* at p. 994; see also *Crosier* v. *United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132, 1139-1140 [198 Cal.Rptr. 361], disapproved on another point by *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 700, fn. 42 [254 Cal.Rptr. 211, 765 P.2d 373]; *Moore* v. *May Dept. Store Co.* (1990) 222 Cal.App.3d 836, 839-840 [271 Cal.Rptr. 841]; *Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 321 [231 Cal.Rptr. 820]; *Clutterham* v. *Coachmen Industries, Inc.* (1985) 169 Cal.App.3d 1223, 1227 [215 Cal.Rptr. 795].)

In its posttrial opinion in the *Pugh* litigation—*Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743 [250 Cal.Rptr. 195] (*Pugh II*)—the Court of Appeal elaborated on the jurisprudential significance of employer discretion: "[A]n employer must have wide latitude in making independent, good faith judgments about high-ranking employees without the threat of a jury second-guessing its business judgment. Measuring the effective performance of such

an employee involves the consideration of many intangible attributes such as personality, initiative, ability to function as part of the management team and to motivate subordinates, and the ability to conceptualize and effectuate management style and goals. . . . [Citations.] *Although the jury must assess the legitimacy of the employer's decision to discharge, it should not be thrust into a managerial role.*" (*Id.* at p. 769, italics added.)

 These statements are helpful in the sense that, by articulating legal policies immanent in the employment relationship, they point the way to the appropriate standard. They do not, however, answer directly the question before us—*what* does the trier of fact decide in evaluating a defense based on employee misconduct? Before the Court of Appeal opinion in this case, California law on the point was comparatively undeveloped. A lone published Court of Appeal decision, however—*Wilkerson* v. *Wells Fargo Bank, supra,* 212 Cal.App.3d 1217 (*Wilkerson*)—had wrestled directly with the issue. In *Wilkerson,* the court held that in a wrongful termination suit by an employee terminable only for good cause, the employer must prove, as part of its defense burden, that the misconduct leading to dismissal actually occurred. That is, *Wilkerson* directs the jury to reexamine the facts on which the employer relied in terminating the employee and, if it finds them erroneous, to award damages.

"[I]n contract law," the court in *Wilkerson* reasoned, "the belief of the breaching party does not determine whether a breach of the contract . . . occurred. Obviously, a defaulting borrower's good faith belief he or she has repaid a loan is not a defense to a lender's claim for payment. Similarly, an employer's subjective belief it possessed good cause does not dispose of a wrongfully discharged employee's claim for breach of contract. . . . [¶] . . . [¶] . . . [A]n employer's belief is not a substitute for good cause. For that reason, the employer's broad latitude does not extend to being *factually* incorrect. If an employer claims the employee was discharged for specific misconduct, and the employee denies the charge, the question of *whether the misconduct occurred is one of fact for the jury.* (*Pugh* v. *See's Candies, Inc., supra,* 203 Cal.App.3d at p. 767.)" (212 Cal.App.3d at p. 1230, second italics added.)

This quotation from *Wilkerson, supra,* 212 Cal.App.3d at page 1230—asserting a proposition central to plaintiff's contention that we should overturn the Court of Appeal's judgment—misreads the passage from *Pugh II, supra,* 203 Cal.App.3d 743, 767, on which it relies. More importantly, it suggests a misunderstanding of the policies identified in our cases as supporting implied-contract-based wrongful termination claims. The first point —that *Wilkerson* misreads the passage from *Pugh II* on which it relied

for the proposition that "the employer's broad latitude does not extend to being *factually* incorrect"—was convincingly made in Justice Miriam Vogel's opinion herein for the Court of Appeal. She pointed out that although *Wilkerson* had relied exclusively on *Pugh II*, that part of the *Pugh II* opinion actually cited as authority is a quotation from a Michigan case— *Toussaint* v. *Blue Cross § Blue Shield of Mich.* (1980) 408 Mich. 579 [292 N.W.2d 880] (*Toussaint*). "What this means," Justice Vogel concluded, "is that *Wilkerson* is based on *Toussaint*, not on *Pugh II*." We agree. (Compare *Pugh II*, *supra*, 203 Cal.App.3d at p. 767, with *Wilkerson*, *supra*, 212 Cal.App.3d at p. 1230; see also *Toussaint*, *supra*, 292 N.W.2d at p. 895.)

The decision of a sharply divided court, *Toussaint*, *supra*, 292 N.W.2d 880, is known and cited principally as Michigan's equivalent of California's *Pugh I*, *supra*, 116 Cal.App.3d 311, that is, the case in which the Michigan Supreme Court adopted the rule that an implied-in-fact "good cause" term can limit the common law at-will employment rule. (*Toussaint*, *supra*, 292 N.W.2d at p. 885; cf. *Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d 654, 676.) The *Toussaint* majority went further, however, and took up the question of *who*—employer or trier of fact—decides whether the misconduct leading to the decision to terminate employment occurred. (*Toussaint*, *supra*, at pp. 895-896.) In concluding the issue of specific misconduct—"did the employee do what the employer said he did?"—was "one of fact for the jury," the *Toussaint* majority posits that a "promise to terminate employment for cause only would be illusory *if the employer were permitted to be the sole judge and final arbiter of the propriety of the discharge. There must be some review of the employer's decision if the [good] cause contract is to be distinguished from the satisfaction contract." (*Toussaint*, *supra*, 292 N.W.2d at pp. 896, 895, fn. omitted.)

Unlike the majority in *Toussaint*, we do not believe permitting juries to decide the factual basis for allegations of employee misconduct is the only way to give meaning and substance to an employer's promise to terminate for "good cause," or that barring such factfinding leaves for-cause provisions toothless. Judicial review of decisions to terminate employees subject to such provisions for misconduct *is* vital; however, de novo jury review of the factual basis supporting the employer's decision is neither the only alternative to a "no review" standard, nor the one best adapted to adjust the competing interests of employer and employee.

Instead of adopting the de novo rule set forth in *Toussaint, supra*, 292 N.W.2d 880, and followed by the Court of Appeal in *Wilkerson*, *supra*, 212 Cal.App.3d 1217, we adopt a different standard under which the jury assesses the factual basis for the decision to terminate employment. The

standard crafted by a number of state high courts which have confronted the issue and rejected the *Toussaint* solution demonstrates that a middle ground —combining a balanced regard for the employee's interest in continuing employment with the employer's interest in efficient personnel decisions— exists. As we explain, these courts have arrived at a standard under which the jury's role is to assess the *objective reasonableness* of the employer's factual determination of misconduct.

In concluding it is the employer that decides whether acts of an employee amounting to just cause have occurred—and that the role of the jury is to assess, through the lens of an objective standard, the reasonableness of that decision under the circumstances known to the employer at the time it was made—these courts have relied for analytical support on the contract model of the employment relationship out of which contemporary limitations on the at-will doctrine arose. (See, e.g., *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, and cases cited at pp. 676-677.) An Oregon decision, *Simpson* v. *Western Graphics Corp.* (1982) 293 Or. 96 [643 P.2d 1276] (*Simpson*), typifies the reasoning of these cases.

In *Simpson, supra,* 643 P.2d 1276, three employees were fired for allegedly threatening a fellow worker. They denied making the threats and filed suit. The trial court found the employer had acted in good faith after a reasonable investigation, refused to make a finding whether the threats had *in fact* been made, and entered judgment for the employer. The Oregon Supreme Court granted review "to consider whether by agreeing to discharge employees only for 'just cause,' a private employer also relinquishes its right to determine whether facts constituting just cause exist." (*Id.* at p. 1278.) Analyzing the contractual origin of the employment relationship, the *Simpson* opinion concluded there was no basis to infer that "the employer *intended to surrender its power to determine whether facts constituting cause for termination exist. . . . In the absence of any evidence of express or implied agreement whereby the employer contracted away its fact-finding prerogative . . . , we shall not infer it.*" (*Id.* at p. 1279, italics added.)

The reasoning of *Simpson, supra,* 643 P.2d 1276, was relied on by the Nevada Supreme Court in *Southwest Gas* v. *Vargas* (1995) 111 Nev. 1064 [901 P.2d 693] (*Vargas*). There the plaintiff employee was fired for sexually harassing a coworker. After he prevailed at trial, the employer appealed. Addressing "the role of the trier of fact in determining whether an employer's stated reasons for terminating an employee with a long-term employment contract amount to good cause," (*id.* at p. 698) the Nevada Supreme Court rejected the argument that the jury reviews de novo the factual basis for the employer's decision and reversed the trial court's judgment. Citing

*Simpson*, the *Vargas* opinion discusses some of the concerns raised by an instruction directing the jury to reexamine the factual accuracy supporting the employer's decision to terminate employment.

"[A]llowing a jury to trump the factual findings of an employer that an employee has engaged in misconduct rising to the level of 'good cause' for discharge, made in good faith and in pursuit of legitimate business objectives, is a highly undesirable prospect," the Nevada high court said. (*Vargas, supra,* 901 P.2d at p. 699.) "In effect, such a system would create the equivalent of a preeminent fact-finding board unconnected to the challenged employer, that would have the ultimate right to determine anew whether the employer's decision to terminate an employee was based upon an accurate finding of misconduct . . . . This ex officio 'fact-finding board,' unattuned to the practical aspects of employee suitability over which it would exercise consummate power, and unexposed to the entrepreneurial risks that form a significant basis of every state's economy, would be empowered to impose substantial monetary consequences on employers whose employee termination decisions are found wanting." (*Ibid.*)

The opinion of the Washington Supreme Court in *Baldwin* v. *Sisters of Providence in Washington* (1989) 112 Wn.2d 127 [769 P.2d 298] (*Baldwin*), demonstrates how these courts have both adopted the contract model of just cause analysis and conjoined with it a requirement that the employer adhere to—and juries apply—an "objective" good faith standard in deciding whether just cause exists to terminate employment. *Baldwin* was a wrongful termination case involving a hospital employee with a "just cause" contract fired for sexually abusing a patient. The high court first applied traditional contract principles. Finding no contract basis for concluding the employer's fact-finding prerogative had been transferred elsewhere, either unilaterally or by agreement, it held that "an employer's agreement to restrict discharges to those supported by just cause should not be followed by a further judicial implication which takes the determination of just cause away from the employer." (*Id.* at p. 304.)

Although the *Baldwin* court thus endorsed the view that the power to decide whether acts amounting to misconduct had occurred continued to reside with the employer, it went on to apply a supplemental standard of "just cause." The court's opinion describes that standard as one which "checks the subjective good faith of the employer with an *objective* reasonable belief standard." (769 P.2d at p. 304, italics added.) " '[J]ust cause,' " the *Baldwin* opinion holds—echoing the formulation in *Pugh I, supra,* 116 Cal.App.3d at page 330—is not only "a fair and honest cause or reason, regulated by good faith," but—presaging our subsequent formulation in

*Scott, supra*, 11 Cal.4th at page 467—is "one which is not for [an] arbitrary, capricious, or illegal reason and which is . . . based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." (769 P.2d at p. 304; see also *Gaglidari v. Denny's Restaurants, Inc.* (1991) 117 Wn.2d 426 [815 P.2d 1362, 1369] [in wrongful discharge suit by employee with "just cause" contract "whether plaintiff was actually fighting is irrelevant . . . , the issue is whether at the time plaintiff was dismissed defendant reasonably, in good faith, and based on substantial evidence believed plaintiff had done so."].)

In *Kestenbaum v. Pennzoil Co.* (1988) 108 N.M. 20 [766 P.2d 280], the New Mexico Supreme Court adopted a standard much like the majority rule exemplified by *Simpson, Vargas,* and *Baldwin.* The trial court had refused an instruction offered by the employer that it need only show a "good faith belief" that employee misconduct had occurred. (*Id.* at p. 287.) Although it rejected the *unqualified* "good faith belief" standard urged by the employer, the court framed a "middle position" between instructing that "an employer only is required to demonstrate a good faith *belief* that cause existed to terminate . . . [and instructing] that the employer must prove good cause *in fact.*" (*Ibid.*, italics added.) According to the opinion in *Kestenbaum*, the jury had been properly instructed that the issue was whether the employer "had *reasonable grounds to believe* that sufficient cause existed to justify [the employee's] termination." (*Ibid.*, italics added.)

Because Pennzoil's proposed instruction suggested a jury "could find good cause from the employer's *subjective* good faith belief as opposed to an *objective* standard of reasonable belief," it would have been error to so instruct. (766 P.2d at p. 288, italics added.) On the other hand, the court said, "the jury could have absolved Pennzoil of liability under its implied contract . . . provided [it] had *reasonable grounds to believe* that sufficient cause existed to justify his termination." (*Id.* at p. 287, italics added; see also *Braun v. Alaska Com. Fishing & Agr. Bank* (Alaska 1991) 816 P.2d 140, 142 [" '[A] discharge for "just cause" is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true.' "], citing *Baldwin, supra,* 769 P.2d at p. 304, and *Simpson, supra,* 643 P.2d at pp. 1277-1279.)

In addition to the answer yielded by formal contract principles, pragmatic considerations support what the *Kestenbaum* opinion calls the "middle position." As several courts have pointed out, a standard permitting juries to reexamine the factual basis for the decision to terminate for misconduct— typically gathered under the exigencies of the workaday world and without

benefit of the slow-moving·machinery of a contested trial—dampens an employer's willingness to act, intruding on the "wide latitude" the court in *Pugh II* recognized as a reasonable condition for the efficient conduct of business. (See, e.g., *Vargas, supra*, 901 P.2d at p. 699.) We believe the *Wilkerson-Toussaint* standard is too intrusive, that it tips unreasonably the balance between the conflicting interests of employer and employee that California courts have sought to sustain as a hallmark of the state's modern wrongful termination employment law. (See, e.g., *Pugh II, supra*, 203 Cal.App.3d at p. 769; see also cases cited, *ante*, at p. 100.)

Equally significant is the jury's relative remoteness from the everyday reality of the workplace. The decision to terminate an employee for misconduct is one that not uncommonly implicates organizational judgment and may turn on intractable factual uncertainties, even where the grounds for dismissal are fact specific. If an employer is required to have in hand a signed confession or an eyewitness account of the alleged misconduct before it can act, the workplace will be transformed into an adjudicatory arena and effective decisionmaking will be thwarted. Although these features do not justify a rule permitting employees to be dismissed arbitrarily, they do mean that asking a civil jury to reexamine in all its factual detail the triggering cause of the decision to dismiss—including the retrospective accuracy of the employer's comprehension of that event—months or even years later, in a context distant from the imperatives of the workplace, is at odds with an axiom underlying the jurisprudence of wrongful termination. That axiom, clearly enunciated in *Pugh II, supra*, 203 Cal.App.3d at page 769, is the need for a sensible latitude for managerial decisionmaking and its corollary, an optimum balance point between the employer's interest in organizational efficiency and the employee's interest in continuing employment.

Plaintiff argues that withdrawing from the jury the factual issue underlying the decision to terminate employment will destroy the protections afforded by the implied good cause contract term. It will permit the discharge decision to be based on subjective reasons, the argument runs, reasons that may be pretextual, and mask arbitrary and unlawful motives made practically unreviewable by a standardless "good faith" rule. But as we have tried to show, this argument is founded on a misunderstanding of the nature and effect of an *objective* good faith standard.[3] The rule we endorse today, carefully framed as a jury instruction and honestly administered, will not

---

[3]Although "good faith" is commonly thought of as subjective in essence, the use of objectified mental states as a legal standard is a familiar feature of Anglo-American law. Juries are routinely asked, for example, to place themselves in the position of the "reasonable person" in resolving questions of negligence liability. The standard is not confined to tort law. We have previously applied an objective standard in the wrongful discharge employment context. (See *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1248 [32 Cal.Rptr.2d

only *not* have the effects plaintiff claims, but by balancing the interests of *both* parties, will ensure that "good cause" dismissals continue to be scrutinized by courts and juries under an objective standard, without infringing more than necessary on the freedom to make efficient business decisions. At least one state high court has reasoned that striking a fair balance between the interests of the parties to the employment contract through an objective just-cause standard will *promote* the continued use of such limitations on the at-will doctrine; imbalances, on the other hand, encourage employers to adopt defensive measures by "remov[ing] such [just-cause] provisions from their [employment] handbooks." (*Baldwin, supra*, 769 P.2d at p. 304.)

The proper inquiry for the jury, in other words, is not, "Did the employee *in fact* commit the act leading to dismissal?" It is, "Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?" The jury conducts a factual inquiry in both cases, but the questions are not the same. In the first, the jury decides the ultimate truth of the employee's alleged misconduct. In the second, it focuses on the *employer's response* to allegations of misconduct. Thus, to follow the Nevada Supreme Court in *Vargas,* we "reaffirm our . . . prior rulings . . . that employers are obligated to act in good faith and upon a reasonable belief that good cause for terminating a for-cause employee exists." (901 P.2d at p. 700; see also *Pugh I, supra*, 116 Cal.App.3d at p. 330 ["[t]he term[] . . . 'good cause' " "connote[s] 'a fair and honest cause or reason, regulated by good faith.' "].)

## B. *The Governing Standard*

It was the precedents from other jurisdictions discussed above—*Simpson, Vargas, Baldwin,* and *Kestenbaum*—on which Justice Miriam Vogel based her opinion for the Court of Appeal, identifying a handful of considerations relevant to the jury's resolution of an employer's defense that an employee terminable only for good cause was properly dismissed for misconduct. We give operative meaning to the term "good cause" in the context of implied

223, 876 P.2d 1022] [standard for determining constructive discharge is objective]; cf. *People v. Machupa* (1994) 7 Cal.4th 614, 618, fn. 1 [29 Cal.Rptr.2d 775, 872 P.2d 114] ["good faith" exception to search warrant requirement focuses on the "objective reasonableness" of the search].) Prosser and Keeton have described the reasonable person—" 'this excellent but odious character' "—as "a personification of a community ideal of reasonable behavior, determined by the jury's social judgment." (Prosser & Keeton (5th ed. 1984) Torts, § 32, pp. 174, 175, fn. omitted.) As the case law cited in the main text makes clear, coupling "good faith" with "objectivity" is intended to place the trier of fact in the position of the "reasonable employer" in deciding whether the defendant in a wrongful termination suit acted responsibly and in conformity with prevailing social norms in deciding to terminate an employee for misconduct.

employment contracts by defining it, under the combined *Scott-Pugh* standard (*ante*, at p. 96), as fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond.

The law of wrongful discharge is largely a creature of the common law. Hence, it would be imprudent to specify in detail the essentials of an adequate investigation. It is better, we believe, to adhere to the common law's incremental, case-by-case jurisprudence, adjusting the standard as its sufficiency is tested in practice. Two descriptions, however—one from turn-of-the-century English common law, the other from an opinion of this court only a little over twenty years ago—provide a sense of what investigative fairness in this context contemplates. In *Board of Education* v. *Rice* (1911) App. Cas. 179, 182, Lord Halsbury, describing the duties of a school board in resolving a claim of salary discrimination, wrote: "I need not add that . . . [the board] must act in good faith and fairly listen to both sides, for that is a duty lying upon every one who decides anything. But I do not think they are bound to treat such a question as though it were a trial . . . . They can obtain information in any way they think best, always giving a fair opportunity to those who are parties in the controversy for correcting or contradicting any relevant statement prejudicial to their view."

Closer to home, Justice Tobriner wrote on behalf of a unanimous court in *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253], that "[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation], nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. . . . [T]his court should not attempt to fix a rigid procedure that must invariably be observed." (*Id.* at p. 555; see also Friendly, *"Some Kind of Hearing"* (1975) 123 U. Pa. L.Rev. 1267, 1269-1270, fn. 10 ["The precise content of the common law 'fair procedure' requirement is far more flexible than that which the Supreme Court has found to be mandated by due process . . . ."].)

All of the elements of the governing standard are triable to the jury.

## IV. *The Disposition*

Because it was error to instruct that Rollins could prevail only if the jury was satisfied sexual harassment actually occurred, the case must be retried.

On retrial, the jury should be instructed, in accordance with the views we have expressed, that the question critical to defendants' liability is not whether plaintiff in fact sexually harassed other employees, but whether at the time the decision to terminate his employment was made, defendants, acting in good faith and following an investigation that was appropriate under the circumstances, had reasonable grounds for believing plaintiff had done so.

We also conclude that a handful of additional issues resolved by the Court of Appeal which plaintiff seeks to reargue here—the admissibility of the Gail Morris affidavit, whether the existence *vel non* of an implied good cause term in plaintiff's employment agreement was an issue that should have gone to the jury, and whether the trial court erred in not instructing on the statutory presumption of employment at will—do not warrant review by this court. Although we have not formally limited the scope of our review in this cause, that does not affect our power to consider "any or all" of the issues addressed by the Court of Appeal. (Cal. Rules of Court, rule 29; cf. *Southern Cal. Ch. of Associated Builders etc. Com.* v. *California Apprenticeship Council* (1992) 4 Cal.4th 422, 431, fn. 3 [14 Cal.Rptr.2d 491, 841 P.2d 1011].)

The judgment of the Court of Appeal is affirmed.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.,** Concurring.—I agree with the majority's holding that the term "good cause" in this context is generally a reasoned conclusion that the employee committed the misconduct, "supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond." (Maj. opn., *ante*, at p. 108.) Although I believe that there are substantial public policy considerations weighing in both the employer's and the employee's favor in this case, the majority's standard best approximates, in my view, the likely bargain struck by an employer and an employee in an implied contract not to terminate except for good cause. Absent evidence to the contrary, we cannot presume that an employer's implied, general promise not to discharge an employee without "good cause" is a promise to achieve such a high degree of certainty that the employee committed the charged misconduct as to ensure invariable agreement by a jury.

I write separately to make three points. First, "substantial evidence" that the employee committed misconduct is not synonymous with "any" evidence. The ultimate determination is whether a *reasonable* employer could have found that an employee committed the charged misconduct based on all

the evidence before it. (See *Kuhn* v. *Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].) Similarly, the requirement that an employee receive notice and an opportunity to be heard is not fulfilled by a charade of due process by an employer that has already made up its mind, but rather signifies "*adequate* notice of the 'charges' . . . and a *reasonable* opportunity to respond." (*Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 [116 Cal.Rptr. 245, 526 P.2d 253], italics added, fn. omitted.) Although we do not dictate the precise form that the employer must adopt, fair procedure requires that the employee have a truly meaningful opportunity to tell his or her side of the story and to influence the employer's decision.

Second, there is nothing, of course, in the majority's standard that precludes an employer and an employee from negotiating or impliedly forming a contract with a "good cause" clause that defines that term more explicitly, in which case the jury's good cause determination would be shaped by this contractual definition. For example, the employment contract may spell out in greater detail the due process protections enjoyed by the employee. (See, e.g., *Scott* v. *Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 460-461 [46 Cal.Rptr.2d 427, 904 P.2d 834].) A court may also reasonably interpret an implied or express employment agreement that contains particularly strong promises of employment security to embody a more protective good cause standard. In short, the majority's definition of "good cause" is a "default" definition that applies only in the absence of more specific contractual provisions.

Third, I note that nothing in the majority opinion is intended to alter the different manner in which the term "good cause" is construed by arbitrators pursuant to a collective bargaining agreement between unions and employers. In such agreements the contract is express, the remedies more limited, the role of the arbitrator in policing collective bargaining agreements well established both contractually and customarily, and the contractual language supplemented by a well developed body of arbitration law concerning the meaning of "good cause" that the parties can be presumed to be aware of at the time they entered the agreement. (See generally, *Sanders* v. *Parker Drilling Co.* (9th Cir. 1990) 911 F.2d 191, 204, 212, fn. 11 (dis. opn. of Kozinski, J.).) The majority's good cause standard does not extend beyond the context in which it is articulated, i.e., implied contracts between employers and individual employees.

Werdegar, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—In 1988, defendant, an insurance brokerage firm, hired plaintiff as its senior vice-president and western

regional manager. Although there was no express agreement as to the conditions under which plaintiff could be terminated, plaintiff contends he had an implied agreement with defendant that his employment could be terminated only for "good cause." In 1993, two women employees accused plaintiff of sexual harassment. After conducting an investigation, defendant concluded that the allegations of harassment were true, and it terminated plaintiff's employment for this misconduct. Plaintiff sued for wrongful termination, alleging that he had not harassed the women and that in terminating his employment ·based on false accusations defendant had breached the implied "good cause" provision. The case was tried to a jury, which expressly found that plaintiff had not engaged in the alleged sexual harassment and awarded plaintiff damages of some $1.78 million for wrongful termination.

At issue here is the precise meaning or content of the "good cause" condition of the parties' implied agreement. The majority treats this issue as essentially one of law, without pausing to consider what the parties might have intended. In my view, however, the issue is one of contract interpretation that should be resolved, if possible, by determining what the parties understood their agreement to be when they entered into it. To determine the parties' intent, a court or jury must examine all evidence relating to the formation of the implied agreement. Only if the court or jury concludes that the parties' intent cannot be determined from this evidence should it undertake to bridge this gap by supplying the meaning that comports with community standards of fairness and public policy.

Moreover, if the court must flesh out the meaning of an implied "good cause" limitation, it should choose the meaning that achieves the fairest and most workable result consistent with the normal practices and expectations of employers and employees in modern society. In my view, the meaning that best satisfies these requirements is one that permits the employer to discharge the employee only for specific acts of misconduct that the employee actually committed. Recognizing that a limitation of this kind puts the employer in a difficult position, and that it may impose liability even on employers who have used their best efforts to determine the truth of misconduct allegations fairly and accurately, I would hold that if an employer agrees to reinstate a falsely accused and wrongfully discharged employee, it should be liable in damages only for backpay.

I

Employment relationships are fundamentally contractual. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 696 [254 Cal.Rptr. 211, 765 P.2d

373].) Because this case involves a dispute between an employer and an employee about the terms of their employment agreement (maj. opn., *ante*, at p. 99), it should be decided by the application of contract law. Although this case involves an implied rather than an express contract (see Civ. Code, §§ 1620 ["An express contract is one, the terms of which are stated in words."], 1621 ["An implied contract is one, the existence and terms of which are manifested by conduct."]), both forms of contract " 'are based upon the expressed or apparent intention of the parties' " (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 888 [41 Cal.Rptr.2d 740], quoting 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 11, p. 46).

It is axiomatic that contract interpretation is governed by the contracting parties' intent. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636; accord, *Foley v. Interactive Data Corp., supra,* 47 Cal.3d 654, 677; Rest.2d Contracts, § 201, com. c, p. 84.) If the terms of the contract are ambiguous or uncertain, as is often true of implied contracts, determining the contract's terms is a question of fact for the trier of fact (here the jury), based on "all credible evidence concerning the parties' intentions . . . ." (*Winet* v. *Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554]; accord, *WYDA Associates* v. *Merner* (1996) 42 Cal.App.4th 1702, 1710 [50 Cal.Rptr.2d 323]; see also BAJI No. 10.75 (8th ed. 1994).) Contract law provides an extensive set of rules to guide the jury in using the available evidence to construe the agreement. (See, e.g., Civ. Code, §§ 1635-1657; 1 Witkin, Summary of Cal. Law, *supra,* Contracts, §§ 684-698, pp. 617-632.)

Here, plaintiff employee claims that he had an implied contract under the terms of which defendant employer could terminate him only for specific acts of misconduct. Defendant contends that the employment relationship was terminable at will or, in the alternative, that if the contract was not terminable at will, defendant could terminate it based upon its own honest and reasonable belief that plaintiff had committed acts of misconduct serious enough to warrant termination. Thus, assuming there was an implied agreement with some form of "good cause" condition, the essence of the dispute concerns whether defendant could terminate plaintiff's employment only for *actual misconduct* (plaintiff's position) or whether defendant could terminate plaintiff's employment if it *reasonably believed,* based on its own investigation, that plaintiff had committed misconduct (defendant's position).

The first step in applying the general principles of contract law to this dispute is for the trier of fact to determine whether an implied contract

existed between defendant employer and plaintiff employee restricting defendant's ability to terminate plaintiff's employment. Here, the trial court ruled that there was such a contract, but the Court of Appeal held that the trial court had erred in making that ruling because the issue should have been submitted to the jury. This court has elected not to review this portion of the Court of Appeal's decision, and the case will be remanded to the trial court to permit the jury to decide that question. If the jury finds on remand that there was no implied contract to terminate plaintiff's employment only for good cause, then plaintiff's employment was terminable at will, and he is not entitled to any relief. (See *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 677 [noting that Labor Code section 2922 establishes a presumption of at-will employment if the parties have not agreed otherwise].) If the jury finds, instead, that there was an implied contract to terminate plaintiff's employment only for good cause, then its next task should be to ascertain the meaning of the good cause condition—that is, what limits the parties intended to impose on the employer's power to terminate the employee for specific acts of misconduct.

I see three possible outcomes to this inquiry. First, the jury might find, as plaintiff employee contends, that defendant employer could terminate plaintiff's employment only if he actually committed misconduct. Second, the jury might find, as defendant contends, that actual misconduct by plaintiff is unnecessary, and defendant may terminate plaintiff's employment based on its own determination that the misconduct had occurred. Third, the available evidence might be insufficient to permit the jury to ascertain what the parties intended when they agreed to the good cause condition. I will discuss each of these potential outcomes.

A. *Parties Intended That Actual Misconduct Would Be Required*

Were the jury to decide on remand that plaintiff employee and defendant employer intended, when they entered into the implied agreement, that defendant could terminate plaintiff's employment for misconduct only if he actually committed that misconduct, then whether defendant breached the agreement by discharging plaintiff for misconduct would depend upon whether plaintiff committed the alleged acts of sexual harassment and, if so, whether this misconduct was serious enough to constitute good cause for termination. But because a jury has already found in this action that plaintiff did not commit the alleged acts of sexual misconduct, there is no need, on remand, for a new jury finding on these issues. Accordingly, a finding by the jury on remand that defendant could discharge plaintiff only for actual misconduct, considered with the prior finding that the misconduct allegations are false, would mean that defendant did breach the implied agreement

by discharging plaintiff. In this event, plaintiff would be entitled to a judgment in his favor awarding damages for breach of contract. The appropriate measure of these damages is a question I address below.

B. *Parties Intended That Employer Determination of Actual Misconduct Would Be Sufficient*

Were the jury to decide on remand that plaintiff employee and defendant employer intended, when they entered into the implied agreement, that actual misconduct by plaintiff would be unnecessary and that defendant could discharge plaintiff based on its own determination that misconduct had occurred, the jury would then need to decide what restrictions, if any, the parties intended to impose on defendant's power to make that determination. There is a fairly broad range of possible answers to this question. The jury might find, for example, that the parties intended that defendant could discharge plaintiff based merely upon defendant's belief, in good faith, that plaintiff had committed misconduct. Or, the jury might find that the parties intended that defendant could discharge plaintiff only if defendant's belief that plaintiff had committed misconduct was both objectively reasonable and arrived at after a reasonable investigation in which plaintiff was notified of the misconduct allegations and given a reasonable opportunity to respond.

Another possibility arises at this point. The jury might find that the parties intended that actual misconduct by plaintiff would be unnecessary and that defendant could discharge plaintiff based on its own determination that the misconduct had occurred, but the jury might be unable to ascertain from the available evidence what restrictions the parties intended to impose on the defendant's power to make the "good cause" determination. If the jury cannot ascertain the parties' intent in this regard, this uncertainty should be resolved by interpreting the employment contract in a way that "comports with community standards of fairness and policy . . . ." (Rest.2d Contracts, § 204, com. d, p. 98.) In my view, when it has been ascertained that an implied good cause condition does not require actual employee misconduct but instead allows the employer to discharge the employee based on the employer's determination of misconduct, the interpretation of that condition that best comports with community standards of fairness and sound policy is as follows: the employer may discharge the employee based on its own determination of employee misconduct only if (1) the employer conducts a reasonable investigation, notifies the employee of the charges, and gives the employee a reasonable opportunity to respond to those charges; (2) the employer's investigation discloses substantial evidence that the employee

committed the misconduct; and (3) as a result of its investigation, the employer reasonably believes that the misconduct took place.[1]

Once the jury has ascertained—from the available evidence of the parties' intent if possible and otherwise by supplying the interpretation that best comports with community standards of fairness and sound policy—what limitations the implied agreement imposed on defendant employer's power to determine whether plaintiff employee committed misconduct, the jury would then proceed to decide whether defendant observed these limitations when it determined that plaintiff had committed the alleged acts of sexual harassment. If the jury finds that defendant acted within the limits that the implied agreement imposed, then defendant did not breach the implied agreement by terminating plaintiff's employment, and defendant is entitled to a judgment in its favor. If, however, the jury finds that the employer did not observe the limits that the implied agreement imposed, then defendant did breach the implied agreement by discharging plaintiff.[2] Accordingly, plaintiff would be entitled to a judgment in his favor awarding damages.

## C. *No Evidence of Parties' Intent*

Finally, the jury on remand might be unable to ascertain whether the parties intended that defendant employer could discharge plaintiff employee only for actual misconduct or whether, instead, they intended that defendant's determination of misconduct would be sufficient. Were the jury to reach this juncture on remand, there again would be a gap in the interpretation of the agreement that would have to be filled by drawing on community standards of fairness and sound policy. (Rest.2d Contracts, § 204, com. (d), p. 98.)

In my view, consideration of community standards of fairness and sound policy leads to the conclusion that when parties have agreed that an employment relationship is terminable only for "good cause," but the meaning of this condition cannot be further ascertained from the available evidence of

---

[1]Although the majority adopts the same standard, the majority applies this standard in a broader context. Unlike the majority, I would not apply this interpretation of the implied "good cause" limitation when the jury is unable to ascertain whether the parties intended that defendant employer could discharge plaintiff employee only for actual misconduct or whether, instead, they intended that defendant's determination of misconduct would be sufficient. This difference is explained, *post*, in part I.C. of this opinion, at pages 115-116.

[2]Had the jury in the prior trial not already determined that plaintiff did not commit the alleged acts of sexual harassment, the jury on remand would be required to decide that question at this juncture. When an employer discharges an employee who actually committed acts of misconduct warranting dismissal, the employee is not damaged by any defects in the procedure that the employer used to make the "good cause" determination, and any breach by the employer would not be material.

the parties' intent, the "good cause" condition should be construed to require actual misconduct by the employee, and not merely the employer's determination of misconduct. I base this conclusion primarily on two interrelated considerations.

First, in our society the usual and expected means of resolving contract disputes are through trial by jury in an action at law. The right to a trial by jury is guaranteed by both the federal and state Constitutions. (U.S. Const., Amend. VII; Cal. Const., art. I, § 16 ["Trial by jury is an inviolate right and shall be secured to all . . . ."].) Although it is increasingly common for contracting parties to provide in their agreements for dispute resolution in an alternative forum, such as by arbitration, it is highly unusual to give one of the contracting parties, rather than a jury or other neutral arbiter, a unilateral right to resolve a factual dispute about the existence of a material breach of the agreement.

Second, the involuntary discharge of an employee for misconduct is a matter of great consequence to the employee. Termination of employment may deprive the employee of his or her only source of income, resulting in economic ruin. The hardship to the employee is greatly magnified when the termination is predicated on specific acts of misconduct, because the resulting stigma may preclude further employment and render the employee a social outcast. Accordingly, absent evidence sufficient to persuade the trier of fact that the parties intended otherwise, an implied condition that employment may be terminated only for good cause should be interpreted to permit the employer to discharge an employee for specific acts of misconduct only if the employee actually committed those acts.

Both the majority and Justice Mosk (in his concurring opinion) reach the opposite conclusion. As they see it, an implied condition that employment may be terminated only for good cause should be interpreted to permit the employer to discharge an employee for specific acts of misconduct that the employee did not actually commit, if the employer believed, erroneously, that the employee did commit them. They reason that to allow a jury, rather than the employer, to determine whether the employee committed misconduct would unduly interfere with an employer's managerial discretion and business judgment, resulting in excessive burdens on the business community. Although I share these concerns, in my view they are more appropriately addressed by limiting the damages that an employee can recover for a wrongful discharge resulting from the employer's good faith but erroneous determination that the employee committed misconduct.

## II

As the facts of this case demonstrate, allowing a jury to second-guess an employer's determination that an employee committed specific acts of misconduct may place employers in a difficult position. If credible allegations of

serious misconduct are made against an employee, as occurred here, the employer must investigate the allegations and determine their truth. The employer's determination of the truth of the allegations will often, as it did here, require resolution of close factual questions involving difficult evaluations of witness credibility and hard choices among conflicting inferences. If the employer is persuaded that the misconduct occurred, but a jury redetermining the same close factual questions is persuaded otherwise, the result may be a judgment imposing crushing monetary damages on an employer who acted reasonably and in good faith. In this case, for example, defendant employer, after receiving allegations that plaintiff employee had committed serious acts of sexual harassment, conducted an investigation that included interviews of 21 persons who had worked with plaintiff. Defendant terminated plaintiff only because it believed, based on the results of this apparently thorough investigation, that plaintiff had committed the alleged acts. Later, a jury awarded plaintiff $1.78 million in damages based upon its contrary finding that plaintiff did not actually commit those acts.

But, as I have explained, the difficulty of the employer's position is matched or exceeded by the plight of a falsely accused and wrongfully terminated employee who is denied all legal redress. False accusations may destroy the employee's reputation and social standing as well as his or her ability to earn a living. The majority and Justice Mosk give insufficient consideration to the effect their decision will have on these employees.

Recognizing the potentially difficult positions of both the employer and the employee, I would define the measure of contract damages recoverable by the employee to better balance the competing interests. I would do so by adapting to private employment the well-established civil service remedy of awarding only reinstatement with backpay for wrongful termination. A wrongfully terminated public employee is entitled to reinstatement with the full amount of salary and benefits from the date of termination until the date of reinstatement, less any amounts the employee earned or reasonably could have earned from employment during that period, but no more. (*City of Ukiah* v. *Fones* (1966) 64 Cal.2d 104, 107 [48 Cal.Rptr. 865, 410 P.2d 369].)

In general, a private employer may not be ordered to reinstate an employee it has wrongfully terminated. (Civ. Code, § 3390, subd. 2; *Scott* v. *Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 473 [46 Cal.Rptr.2d 427, 904 P.2d 834].) Therefore, the civil service measure of damages may not be applied to the private sector without some modification. This is achieved by requiring both the employee and the employer to make an election regarding reinstatement of the employment. If a wrongfully terminated private-sector employee elects reinstatement, and the employer agrees to reinstate the employee, the employee's recovery would be limited to the amount of lost

salary and benefits, less any sums that the employee earned or reasonably could have earned, between the date of termination and the date of reinstatement. If a wrongfully terminated private-sector employee refuses reinstatement, essentially the same measure of damages would apply and the employee's recovery would be limited to the amount of lost salary and benefits, less any sums that the employee earned or reasonably could have earned, between the date of termination and the date of election. Thus, an employee who rejects reinstatement, for whatever reason, would thereby forfeit any claim to compensation for loss of employment income for the period following the employee's election. Finally, if a wrongfully terminated private-sector employee elects reinstatement, but the employer refuses reinstatement, the employee's recovery would not be limited to backpay but would include the agreed salary and benefits for the entire period of service, both past and future, less the amounts the employee earned or reasonably could have earned during the same period. (*Parker* v. *Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615]; see *Scott* v. *Pacific Gas & Electric Co., supra,* 11 Cal.4th at p. 468.) Thus, an employer who refuses, for whatever reason, to reinstate a falsely accused and wrongfully terminated employee to his or her former position thereby chooses to incur a larger damage award.

Application of this modified measure of damages to private employment would best accommodate the competing interests of the employer and the employee. The employee would receive compensation for the loss actually suffered by the wrongful termination. The employer, unless it chose to do so, would not risk potentially crushing liability for a good faith but erroneous determination of employee misconduct.

I would remand this case for further proceedings consistent with the views I have here expressed.

Respondent's petition for a rehearing was denied February 25, 1998. Kennard, J., was of the opinion that the petition should be granted.