Filed 6/28/24  Lim v. City of Downey CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THOMAS LIM, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF DOWNEY, <br><br> Defendant and Respondent. | B326822 <br><br> (Los Angeles County <br> Super. Ct. No. 21STCV20977) <br><br> **REDACTED OPINION FOR PUBLIC VIEW**[*] |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas D. Long, Judge.  Affirmed.

Brock & Gonzales, D. Aaron Brock, Christina R. Kerner, Elizabeth A. Siruno; Pletcher Law and Andrew S. Pletcher for Plaintiff and Appellant.

---

[*] This case involves material from a sealed record.  In accordance with Civil Code section 3426.5 and California Rules of Court, rules 8.45, 8.46(g)(1) and (2), we have prepared both public (redacted) and sealed (unredacted) versions of this opinion.  We order the unredacted version of this opinion sealed.

Liebert Cassidy Whitmore, Geoffrey S. Sheldon and Alex Y. Wong for Defendant and Respondent.

—————————————

Plaintiff Thomas Lim was injured while on duty as a probationary police officer for defendant City of Downey (City) and placed on disability leave.  While on disability leave, Lim engaged in physical activity that violated his work restrictions and then made sworn statements in a workers' compensation deposition denying such physical activity.  After Lim was cleared to return to work, and while he was still a probationary at-will employee, City terminated Lim's employment because it believed he had engaged in workers' compensation fraud.

Lim sued City under the Fair Employment and Housing Act (FEHA; Gov. Code,[1] § 12900 et seq.) for disability discrimination, retaliation, failure to accommodate, failure to engage in the interactive process, and failure to prevent discrimination or retaliation.  City moved for summary judgment, arguing it had a legitimate reason to fire Lim because it believed he had engaged in fraud.  City further argued Lim could not prove at least one element of each of his causes of action.  The trial court granted the motion.

On appeal, Lim argues several triable issues of material fact exist.  We conclude the trial court did not err in granting summary judgment.  Accordingly, we affirm.

_____

[1] All unspecified statutory references are to the Government Code.

2

## FACTUAL AND PROCEDRAL BACKGROUND

### A.  Factual Summary[2]

  1.  *Lim's Employment, On-duty Injury, and Disability Leave through March 15, 2019*

In May 2018, Lim began his employment with City as a police officer.  His probationary period ran for 18 months, concluding on December 1, 2019.[3]  During this probationary period, Lim was an at-will employee, and City could release him from employment for any legal reason upon giving him two weeks' notice prior to the end of the period.  After Lim's probation concluded, City could terminate his employment only for good cause.

On December 8, 2018, Lim responded to a traffic collision as part of his official duties.  As he investigated the accident, a car struck and injured him.  Lim was taken to the emergency room and placed off work for two weeks.  Lim then returned to work, but experienced discomfort in his spine, leg, and hip.  He attempted to "push through the pain," but other officers who noticed Lim's discomfort encouraged him to take additional time off to seek medical treatment.

On January 4, 2019, Lim's personal doctor at Kaiser Permanente provided a list of work restrictions, effective through January 25, 2019.  The doctor observed that if the work restrictions could not be accommodated, Lim should be

---

[2] We draw our factual summary from the evidence submitted by both parties in connection with the summary judgment motion.

[3] The city manager could extend the probationary period up to an additional six months.

3

considered temporarily totally disabled. The restrictions included that Lim could not do any one of the following activities for more than 20 cumulative minutes per hour: stand, walk, sit, bend at the waist, or twist his torso or spine. He also could not lift, carry, push, or pull anything more than five pounds and needed to be able to lie down for 20 minutes each hour. City could not accommodate the work restrictions and placed Lim on temporary total disability leave.[4]

According to Lim, "[he] struggled to get recommended treatments approved through workers' compensation. Therefore, [he] continued to seek medical care from [his] personal doctor [and] received many adjustments to [his] treatment plan in order to attempt to find relief. For example, [he] had been provided with crutches at the onset of [his] injury; however [his] doctor later instructed [him] to lessen [his] use of crutches in order to build strength in [his] leg. After that, [he] was only to use crutches when [his] pain increased and/or when [he] would be required to be on [his] feet for long periods of time." Lim regularly updated City regarding his medical status and need for continued leave.

Downey Police Department (DPD) Police Chief Dean Milligan was responsible for the daily operations of the department, including hiring and firing of DPD employees and employee discipline. He "had no concerns or hard feelings that [Lim] filed a workers' compensation claim or needed medical

---

[4] Lim's leave was pursuant to Labor Code section 4850, which provides police officers injured in the course of their duties with a leave of absence without loss of salary for the period of their disability, not to exceed one year. (*Id*., subd. (a), (b)(1).)

4

leave given that on-duty injuries [were], in [his] experience, frequent in police work."

On February 12, 2019, a doctor at Tower Orthopaedic & Sports Medicine (Tower) extended Lim's work restrictions through March 14, 2019. Lim did not return to work on March 15, 2019. On that date he texted a DPD sergeant that, "I am trying my best to recover and [am] going to start jogging and running since the doctor said he's going to get me started with [physical therapy]." The sergeant responded, "Don't do anything that is going to aggravate it further. Your health is most important. Just focus on getting better so you can come back."

2. *City Receives Information Concerning Alleged Workers' Compensation Fraud, late March 2019 through September 4, 2019*

In late March 2019, City's human resources director James McQueen received information suggesting that Lim might be engaging in physical activities associated with a basketball league while on temporary total disability leave. McQueen contacted City's workers' compensation third party administrator, AdminSure, and agreed to their recommendation to investigate Lim for possible fraud. AdminSure hired RJN Investigations (RJN) to conduct a *sub rosa* investigation.

AdminSure claims adjuster Blanca Magana handled Lim's worker's compensation claim. McQueen received periodic updates from her, which he shared with Chief Milligan.

On April 1, 2019, Magana emailed McQueen, stating that Lim "runs a basketball league in Los Angeles." She reported that on April 11, 2019, Lim ran a number of errands, used his crutches only while at a medical appointment and at the Americana at Brand, and "unload[ed] several items from [his]

5

vehicle." "[A] day or two after he was found applying pressure, twisting and turning on both feet, and then up to get into the vehicle [*sic*] as well, [with] no supports."

On April 25, Magana reported in "surveillance investigations that took place" on April 5, 6, 11, 17, and 18, 2019, that Lim was observed to walk both with and without crutches. "He displayed no restriction . . . [and] was observed carrying several heavy items while walking back and forth. He was entering and exiting and driving . . . vehicles with no signs of hesitation." She stated, "There's potential to proceed with filing for fraud" and noted that RJN would submit exhibits to the district attorney for criminal investigation. Magana attached eight photographs to her email, at least three of which show Lim carrying bulky items. Lim later testified that in one or more of the photographs, he was carrying chairs. On a later date, Magana provided additional photographs of Lim carrying bulky items, including dragging boxes with both hands, rising to his toes or balls of his feet to hang a basketball league banner, and climbing a chain link fence that appears to be approximately 10 feet tall to hang the banner and to get to the other side of the fence.

Chief Milligan declared that in late April 2019, "[he] was informed that RJN's investigation uncovered information suggesting that [Lim] engaged in workers' compensation fraud when he was seen carrying several heavy items, entering and exiting vehicles without hesitation, and displaying no restrictions. For example, surveillance photo[graph]s provided to . . . City depicted [Lim] carrying objects and walking without the use of crutches while volunteering for the X League Nation Basketball League. Additional photo[graph]s and reports showed

[Lim] scaling a fence four times in order to hang a sign for X League."[5] "Based upon what [Chief Milligan] had already seen and heard about [Lim]'s physical activities, [he] believed there were already sufficient grounds for releasing [Lim] from his probationary employment." He did not do so, however, because RJN and AdminSure did not want to compromise the investigation given the potential for a criminal referral.

On May 22, 2019, Lim came to the police station. Stills of surveillance video show him using crutches. According to Chief Milligan, Lim moved down the police-station hallway "in [an] extremely slow pace, so slow that the cameras, which were motion activated, didn't capture his entire path. It only captured snippets, oftentimes triggered . . . by people who were walking past him or [in] the same direction." AdminSure reported to McQueen that that same day, Lim attended a doctor's appointment but did not use crutches while in the waiting area. McQueen shared this information with Chief Milligan.

On June 4, 2019, Magana provided McQueen with photographs and video stills from RJN's surveillance on June 1, 2019. They depicted Lim carrying items from a van, including LED signs and folding tables, without any visible restrictions or limitations, and bending to place items on the ground. They also showed Lim helping to balance an unknown male who was holding onto a basketball rim. McQueen shared the photographs with Chief Milligan.

---

[5] The trial court sustained a hearsay objection to several statements relating to the truth of what the investigation revealed or what other people told Chief Milligan and McQueen. However, the court admitted the statements to show their effect on Chief Milligan and McQueen.

Lim later submitted his own video of him assisting the man hanging from the basketball rim. In it, Lim, who was standing, pulled a chair backwards on the basketball court with his left hand. Then, a man who is as tall as or taller than Lim jumped up and grabbed the basketball hoop with both hands. Lim then approached the man, who was attempting to untangle the basketball net from the rim. For five seconds, Lim offered support by pressing upward on the man's buttocks. While doing so, Lim shifted his weight forward from his heels to the balls of his feet. Lim then cupped his hands under the man's left foot, and the man untangled the net with his left hand while holding onto the rim with his right. Twenty-nine seconds elapsed between the time Lim first placed his hands under the man's foot and the moment another individual stepped in to support the man's right foot. Lim and the other individual continue to support the man untangling the net for another eight seconds.

Lim's deposition in the workers' compensation matter was taken on July 12, 2019. On August 20, 2019, Magana's supervisor, claims manager Linda Jones, emailed McQueen, informing him that RJN had completed their initial investigation. The investigator's email, which Jones forwarded to McQueen, stated that the investigator agreed the matter should be referred to the district attorney and the fraud division of the Department of Insurance, but the investigator wanted to take additional steps before doing so. McQueen advised Chief Milligan that RJN believed Lim's case warranted referrals to the district attorney and Department of Insurance.

By September 4, 2019, RJN had completed its report to support a suspected fraudulent workers' compensation insurance

8

claim (FD-1 report). Jones forwarded the report to McQueen, who reviewed it with Chief Milligan.

    3.    *The FD-1 Report*[6]

The FD-1 report included a chronological description of information from Lim's medical records and RJN's investigation, and excerpts from Lim's workers' compensation deposition. According to the FD-1 report, Lim's insurance reported that in October 2011, Lim sustained low back injuries from a 2011 automobile accident. He experienced "extreme pain and suffering as well as impairment of his daily activities. A demand to settle the case for $22,500.00 was issued."

After being injured on December 8, 2018 while on duty, Lim

    The doctor recommended that Lim start physical therapy. On March 23, 2019, Lim went to the emergency room due to increased pain in his lower back, "which caused difficulties ambulating."

On April 11, 2019, the doctor at Tower "provided [Lim] with crutches to [help] him with ambulation." On April 16, 2019, RJN completed its first report, which included still images of Lim carrying several items.

RJN reported that on April 27, 2019, Lim climbed and jumped down from a chain link fence four times and

---

[6] The trial court granted City's unopposed application to place the FD-1 report under seal on the basis that it is a confidential peace officer personnel record pursuant to Penal Code sections 832.7 and 832.8, and may also be confidential pursuant to Insurance Code section 1877.4. Under California Rules of Court, rule 8.46, we also treat the contents of the report that are not otherwise public as confidential.

.

The FD-1 report chronology then included RJN's photographs or still images from June 1, 2019, in which Lim carried LED signs and folding tables from a van and supported at least part of the weight of a man who was untangling a basketball net from the rim of the hoop.

During his July 12, 2019 deposition in the workers' compensation matter, Lim testified he did not have injuries or experience any pain as a result of the 2011 automobile accident and did not file an insurance claim relating to that accident.[7] Since February or March 2019, he has needed crutches "here and there" because it helped with the pain. He was not supposed to use the crutches every day because doing so would make his leg weaker. Lim further testified that since December 2018, he cannot lift more than five pounds. Other than watching basketball or taking his two-year-old daughter to the park, Lim did not have any hobbies. Counsel asked, "So since you've been off work, have you essentially been staying home because of the pain?" Lim responded, "Yes, sir." "So other than going out to eat or, I don't know, maybe putting gas in the car, you basically have to stay home because of the pain; is that right?" Lim again responded, "Yes, sir." Counsel asked, "No other activities?" Lim answered, "No, sir." Lim testified that since the injury, he lies down at home about eight hours a day, seven days a week because of the pain. Counsel asked whether Lim engaged in any physical activities "such as running, jumping, jogging, climbing?"

---

[7] During his August 2, 2022 deposition in the FEHA lawsuit, Lim testified he did not recall being in an accident in 2011.

Lim responded, "Right now I don't think I could do them, sir." Counsel then asked, "For instance, I mean, knowing how you feel with regard to your foot, your leg, and your low back, do you think you could be doing running, jumping, trying to scale a fence or a wall like that[?]" Lim responded, "No."

RJN concluded that it appeared that Lim made material misrepresentations regarding his prior automobile accidents, sustained injuries, daily activities, and crutch use, and withheld information about his basketball league, "X League Nation."

In his declaration, Chief Milligan observed that the FD-1 report indicated that Lim "made false statements [in his workers' compensation deposition] that conflicted with the surveillance. For example, he stated that since he had been off work, he had been staying at home because of the pain and that other than putting gas in the car, or going out to eat, he did not engage in any other activities. However, there was photographic evidence of him engaging in activities on multiple days related to a basketball league."

4.    *Lim Seeks to Return to Work and Is Terminated*

On September 19, 2019, Lim submitted a doctor's note that he was "TTD [totally temporarily disabled] until [October 9, 2019]." Then, he could return to modified work between October 10 and October 17, 2019, "with desk work [being] acceptable, no contact [with the] general public until next appointment." Human resources consulted with DPD to determine whether it could accommodate the restriction. According to City human resources manager Sandra Vera, DPD advised it could not because the only light duty position was the front desk position, which required contact with the general

11

public.[8]  Vera spoke with Lim and told him the restrictions could not be accommodated.  According to Lim, this call took place on September 20, 2019.  He testified he "would not know" whether DPD had any peace officer position, including a desk assignment, that did not include contact with the general public.  Nor did he have any understanding of what City did with his doctor's note once his supervisor received it.

On October 3, 2019, Lim texted a DPD lieutenant asking what shift he would be assigned if he were released to full duty.  The lieutenant asked Lim to provide an updated doctor's release, which Lim stated he would provide after he saw his doctor.  The lieutenant shared the communication with Vera and McQueen.  On October 4, 2019, Lim again inquired about "the schedule," and the lieutenant again requested a doctor's note and informed Vera and McQueen.

On October 17, 2019, Lim submitted a note from his doctor, releasing him to regular work as a police officer without any restrictions.  During his August 2, 2022 deposition in the FEHA lawsuit, Lim did not recall why his doctor felt he was able to return to work without restriction as of October 17, 2019, but had been asking his doctor to do so for a couple of months.

By a November 8, 2019 memorandum, Chief Milligan notified Lim that he decided to release Lim from his probationary

_____

[8] The trial court sustained a hearsay objection to what DPD advised human resources about an available position, although it admitted the statement "for other purposes, such as to show the effect of that communication on the declarant."  Because the parties' arguments refer to the front desk position, we include it here, understanding it was not admitted for the truth of the matter.

12

position as a City police officer, effective that day. Prior to making this decision, Chief Milligan consulted with legal counsel. In the notice, Chief Milligan explained he "made this decision because it [came] to [his] attention that [Lim] . . . engaged in activities that [were] inconsistent with the medical work restrictions imposed as a result of an alleged injury and/or that [Lim] may have engaged in other activities or behaviors that suggest workers' compensation fraud. To be clear, [Lim was] not being released from probation merely because [he] . . . made a claim for workers' compensation benefits. Rather, [Chief Milligan] . . . made this decision because of suspected fraud on [Lim's] part. Given the importance of honesty and integrity in the law enforcement profession, the City is unwilling to take the chance of [Lim] becoming a full-time tenured police officer." The notice offered Lim an opportunity to meet with Chief Milligan at a name-clearing meeting pursuant to *Lubey v. City and County of San Francisco* (1979) 98 Cal.App.3d 340.[9]

> 5. *Additional Testimony from Chief Milligan and McQueen*

Both Chief Milligan and McQueen declared that based upon the information they received from AdminSure and RJN,

---

[9] "*Lubey* hearings are available to probationary [officers] who are discharged based on allegations of misconduct. A protected ' "liberty interest" ' is involved because they may have their reputations stigmatized and thus may have additional difficulty obtaining another law enforcement job. *Lubey* provides a right to appeal for the limited purpose of name-clearing. (See *Lubey v. City and County of San Francisco*, *supra*, 98 Cal.App.3d at pp. 346-347 . . . .)" (*Trejo v. County of Los Angeles* (2020) 50 Cal.App.5th 129, 137, fn. 3.)

13

Lim was likely engaging in workers' compensation fraud and had lied during his deposition. Accordingly, even if an accommodation was available, City would not have brought Lim back to work until it was satisfied Lim had not engaged in fraud. Chief Milligan observed that after an officer completes the probationary period, City would have to go through a time-consuming and expensive termination process. He believed it was therefore in City's best interest to release Lim from his employment before the end of the probationary period while he was an at-will employee. In making this decision, Chief Milligan relied on, among other things, the completed investigation report. He understood that police officer injuries are a regular part of the profession. That Lim went out on medical leave, had an actual or perceived disability, or requested reasonable accommodations had no bearing on Chief Milligan's decision to release Lim from his employment. Chief Milligan did not consider whether a workers' compensation investigation might be biased against the injured person. He did not look into the qualifications of the outside investigators. When asked whether he took steps to determine the quality of the investigation, Chief Milligan observed he was provided with photographs and the investigator's comments depicting the nature, place, and time of the photographs, and based on that "never had a concern for the abilities of the investigative team." He did not verify the investigation or that the still images were accurate depictions of the video recording of Lim. He "would not [have] act[ed] upon information that [he] did not believe to be correct" but said he personally did not "need to verify everything to prove that it [was]."

### 6. *Lim's Deposition*

At his deposition in the FEHA lawsuit, Lim testified he did not recall being in an accident in 2011 or receiving any settlement related to that accident.  Counsel asked Lim whether he believed his injuries from the December 8, 2018 accident, rather than the suspected workers' compensation fraud, was the real reason that Chief Milligan released Lim from probation.  Lim responded, "Well, they released me based upon what they gave me on the paper, sir.  That's what I believe and that's what I know."  Chief Milligan did not indicate to Lim that he was upset that Lim had been injured or that Lim had to take medical leave.  When asked whether he was not allowed to return to work on modified duty because he requested or took medical leave, Lim responded, "I would not know, sir."  Lim did not know whether DPD had any position for a peace officer that did not have contact with the general public.  On October 17, 2019, the date Lim was released to return to work with no restrictions, he was still in pain.  Lim testified, "I know that my peers and supervisors really cared . . . about me, and they checked in on me. . . .  [T]hey wanted what was best for me.  They wanted me to heal and take my time and not rush back and come back to work like I did two weeks after. . . .  And that's including the chief."  No one ever told him that they wanted him to come back sooner than he was medically able to do.

### 7. *Lim's Declaration*

Lim declared that no one at City ever interviewed him about whether he engaged in workers' compensation fraud.  Additionally, although his personal doctor cleared him to return to work without restrictions in October 2019, he "was not allowed to return to work."  On November 7, 2019, the workers'

15

compensation medical examiner evaluated Lim and determined Lim did not have any further work restrictions. Lim claims he did not engage in workers' compensation fraud, nor has he been charged with such fraud.

On February 12, 2021, following a multiplanar reconstruction MRI, a doctor described Lim as suffering from "[s]ignificant irritative change affecting the left sciatic nerve . . . as well as superior gluteal nerve irritation" and diagnosed Lim with piriformis syndrome.

Lim requested a *Lubey* hearing on May 13, 2021. At the conclusion of that hearing, City upheld his termination and maintained that Lim was suspected of fraud.

## B. Lim's Complaint and City's Motion for Summary Judgment

On June 4, 2021, Lim filed a complaint against City pursuant to FEHA alleging City terminated him on account of his disability and in retaliation for requesting reasonable accommodation. He further alleged City failed to accommodate, failed to engage in the interactive process, and failed to prevent discrimination and retaliation.

On September 27, 2022, City moved for summary judgment. It argued Lim could not establish that City discharged him because of his alleged disability or in retaliation for alleged protected activity, and that City had a legitimate, non-pretextual reason for terminating Lim because it reasonably believed Lim had engaged in workers compensation fraud. City argued it was not liable for failing to accommodate Lim because, among other reasons, it did not have a vacant position that satisfied his work restrictions and, thus, reasonably accommodated him by placing him on disability leave. Because City had inquired whether there

16

were assignments available that satisfied his work restrictions, Lim could not establish that City failed to engage in a good-faith interactive process with him. Additionally, because Lim could not establish his claims for discrimination or retaliation, his cause of action for failure to prevent discrimination or retaliation failed.

Lim opposed City's motion. Relevant to this appeal, Lim argued he could demonstrate triable issues that City's claimed reason for terminating him was pretextual through temporal proximity (that City decided to discharge him soon after he went out on disability leave), City's inadequate investigation, the falsity of City's proffered reasons for termination, and because City targeted him. He further argued triable issues existed as to City's failure to accommodate or engage in the interactive process because he "did not need a transfer accommodation. He needed a leave of absence accommodation."

## C. The Trial Court's Ruling

The trial court found that City had legitimate, nondiscriminatory, and nonretaliatory reasons for terminating Lim's employment and that Lim failed to present evidence of pretext. Thus, Lim could not demonstrate a triable issue for his claims for discrimination, retaliation, or failure to prevent discrimination and retaliation. The court found Lim also did not submit evidence demonstrating a triable issue as to his causes of action for failure to engage in the interactive process and failure to accommodate. The court observed City provided the requested accommodation—placement on paid disability leave—and Lim did not demonstrate City had a duty to accommodate him when there were no positions that fit his restrictions.

17

The trial court granted the summary judgment motion and entered judgment in favor of City. Lim timely appealed.

## DISCUSSION

### A. Summary Judgment Framework and Standard of Review

A trial court properly grants a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.) "An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]. 'Thus, while the court in determining a motion for summary judgment does not "try" the case, the court is bound to consider the competency of the evidence presented.' [Citation.]" (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196-197.)

We review the trial court's summary judgment ruling de novo. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) We liberally construe the evidentiary submission of the party opposing summary judgment while strictly scrutinizing the moving party's showing and resolve any evidentiary doubts or ambiguities in the opposing party's favor. (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1083.)

18

**B. Lim Has Not Raised a Triable Issue as to His Causes of Action for Discrimination, Retaliation, or Failure to Prevent Discrimination or Retaliation**

Under FEHA, an employer may not discharge an employee "because of" a physical disability unless the employee is unable to perform his or her essential duties even with reasonable accommodation. (§ 12940, subd. (a).) Nor may an employer discharge an employee in retaliation for requesting accommodation for a physical disability. (*Id.*, subd. (m)(2).) Further, it is unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination . . . from occurring." (*Id.*, subd. (k).)

1. *Lim Has Not Adduced Evidence that His Disability Played a Motivating Role in His Termination*

Because "direct evidence of intentional discrimination is rare, and . . . such claims must usually be proved circumstantially" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354), California courts generally employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (93 S.Ct. 1817, 36 L.Ed.2d 668) to FEHA-based discrimination and retaliation claims. (See *Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1042; *Guz v. Bechtel National, Inc.*, *supra*, at p. 354.) However, "*disability* discrimination cases often involve direct evidence of the role of the employee's actual or perceived disability in the employer's decision to implement an adverse employment action." (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 123.) Thus, in such cases, courts should first "determine whether there is direct evidence that the motive for the employer's conduct was related to the employee's physical . . . condition" before applying the *McDonnell Douglas*

19

burden-shifting analysis. (*Wallace v. County of Stanislaus, supra*, at p. 123.)

In the trial court, Lim did not identify any direct evidence supporting his contention that City discharged him because of his disability. Rather, Lim argued City discharged him based on a mistaken belief that he engaged in "misconduct, which was related to Lim's disability and need for accommodation." Lim then sought to analogize City's purported mistaken belief with those identified in *Wallace v. County of Stanislaus, supra*, 245 Cal.App.4th 109 and *Glynn v. Superior Court* (2019) 42 Cal.App.5th 47, in which appellate courts found direct evidence of discriminatory intent.

*Wallace* and *Glynn* state that an employer may be liable under FEHA if it discharges an employee based upon even a mistaken belief that the employee had a disability that prevented the employee from safely performing essential job functions, even with reasonable accommodation. (See *Glynn v. Superior Court, supra*, 42 Cal.App.5th at p. 54; *Wallace v. County of Stanislaus, supra*, 245 Cal.App.4th at pp. 115, 124-125.) The *Wallace* court explained, "the Legislature declared that California's definitions of physical disability, mental disability, and medical condition are broad and are intended to be construed to protect employees . . . 'from discrimination due to an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling.' (§ 12926.1, subd. (b).) The term 'perceived' has some bearing on the employer's state of mind or motive . . . . The Legislature also declared that the statutory definitions of physical and mental disability 'provide protection when an individual is *erroneously or mistakenly believed* to have any physical or mental condition that

20

limits a major life activity.' (§ 12926.1, subd. (d) . . . .)" (*Wallace v. County of Stanislaus, supra,* at p. 124, fn. omitted.) Thus, "the Legislature decided that the financial consequences of an employer's mistaken belief that an employee is unable to safely perform a job's essential functions should be borne by the employer." (*Id.* at p. 115.)

Assuming arguendo that City discharged Lim due to a mistaken belief, it was not one that Lim had a physical condition that limited a major life activity or his ability to perform the essential functions of the job as in *Wallace* and *Glynn*. As Lim acknowledged, it was instead a purportedly mistaken belief that Lim had engaged in misconduct. *Wallace* and *Glynn* are thus inapposite.

Lim argues on appeal that the fact "Chief Milligan cited Lim's failure to use crutches as a primary reason for termination" is direct evidence that City had a mistaken belief about his disability. We first observe that although the parties discussed Lim's use of crutches in the trial court, this is the first time Lim has argued this fact is direct evidence of discrimination. "[U]nless they were factually presented, fully developed and argued to the trial court, potential theories which could theoretically create 'triable issues of material fact' may not be raised or considered on appeal." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.) Even if we considered this argument, it mischaracterizes the evidence. Chief Milligan explained Lim's alleged fraud was the reason he decided to fire Lim and cited to the fact that Lim did not use crutches merely as evidence of that fraud.

     2.    *Lim Has Not Demonstrated a Triable Issue of Pretext*

We next turn to the *McDonnell Douglas* burden-shifting

21

analysis used when a court considers circumstantial evidence of discriminatory or retaliatory intent.  Under this test, the plaintiff must first establish a prima facie case of disability discrimination or retaliation.  (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 354; *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1109.)  The elements of a prima facie case of disability discrimination are that the plaintiff " '(1) suffered from a disability or was regarded as suffering from a disability, (2) could perform the essential duties of a job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability.' [Citations.]"**10** (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 31.)  To establish a prima facie case of retaliation, the " 'plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' [Citation.]" (*Loggins v. Kaiser Permanente Internat.*, *supra*, at p. 1109.)

" 'A satisfactory [prima facie] showing . . . gives rise to a presumption of discrimination [or retaliation] which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff.' [Citations.]  [¶]  Under the second step of the *McDonnell Douglas* test, 'the employer may dispel the presumption merely by articulating a legitimate,

_____

**10** In *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, our Supreme Court held a FEHA " 'plaintiff must produce evidence sufficient to show that an illegitimate criterion was a *substantial factor* in the particular employment decision.' " (*Id.* at p. 232.)

22

nondiscriminatory [or nonretaliatory] reason for the challenged action. [Citation.] At that point the presumption disappears.' [Citation.] Under the third step of the test, the 'plaintiff must . . . have the opportunity to attack the employer's proffered reasons as pretexts for discrimination [or retaliation], or to offer any other evidence of discriminatory [or retaliatory] motive.' [Citation.]" (*Zamora v. Security Industry Specialists, Inc.*, *supra*, 71 Cal.App.5th at pp. 31-32; see *Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 94 [describing *McDonnell Douglas* for retaliation claims].)

We have previously articulated the order of the *McDonnell Douglas* burdens in the summary judgment context as somewhat reversed. (See *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344.) Specifically, " ' "[i]f the employer presents admissible evidence either that one or more of [the] plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory [or nonretaliatory] factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." ' " (*Ibid.*, italics omitted.) "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory [or retaliatory]." (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 361, fn. omitted.)

The parties disagree whether Lim has or can establish a prima facie case of discrimination or retaliation. We need not resolve this dispute because an alternative analysis under the second step of *McDonnell Douglas*, under which City offered

23

evidence that it had a legitimate, nondiscriminatory, nonretaliatory reason for discharging Lim, disposes of Lim's disability discrimination and retaliation claims. (See *Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 357.) Because Lim's arguments concerning City's proffered legitimate reason and pretext are the same for his causes of action of discrimination and retaliation, our below discussion concerning discrimination applies equally to his retaliation claim.

### a. City's Legitimate, Nondiscriminatory Reason for Discharging Lim from Employment

City adduced evidence that it discharged Lim because it believed he had engaged in workers' compensation fraud. Chief Milligan, who had the authority to discharge Lim, declared that based upon the information he received from AdminSure and RJN he "believed it was reasonably likely that [Lim] was engaging in workers' compensation fraud." The bases for that belief included that Lim engaged in activities inconsistent with his work restrictions and that Lim was dishonest during his workers' compensation deposition. This is borne out in Chief Milligan's November 8, 2019 notice to Lim, in which he described that he decided to discharge Lim because he "[(1)] engaged in activities that [were] inconsistent with the medical work restrictions imposed as a result of an alleged injury and/or [(2)] that [Lim] may have engaged in other activities or behaviors that suggest workers' compensation fraud."

### b. Lim's Arguments Concerning Pretext

Lim does not directly dispute that City could terminate him for any legal reason during his probationary period, including suspected fraud. Instead, he argues he demonstrated a triable issue of material fact as to pretext because (a) City's explanation

24

was unworthy of credence, (b) his job performance was satisfactory, (c) City's investigation was inadequate, (d) City decided to discharge him soon after he went out on disability leave (temporal proximity), and (e) City targeted him when it "raced to terminate [him] in November 2019 before the end of his probation."

(i)  <em>Unworthy of Credence</em>

Lim argues that he can show a triable issue as to pretext because City's proffered reasons were "unworthy of credence." Lim cites *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133 (120 S.Ct. 2097, 147 L.Ed.2d 105) and *Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th 317 to support his argument.  In those cases, the courts used the phrase "unworthy of credence" to describe instances in which a plaintiff put forth evidence that the employer's proffered reason was false.  As *Guz* explained, "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination.  [Citation.]  Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons.  [Citation.]  Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions.  [Citation.]" (*Guz v. Bechtel National, Inc.*, *supra*, at pp. 360-361.)

Lim argues City's proffered reasons for discharging him are not valid because he was not required to use crutches.  But this argument that crutches were not part of Lim's work restrictions does not demonstrate that City's reason for discharging Lim was

25

unworthy of credence. The issue is not whether crutches were required but Lim's inconsistent use of them and the contexts in which he chose to use and not to use crutches. Lim chose to use crutches on May 22, 2019, when he visited his employer, even though he had been observed not using them previously during a *sub rosa* investigation. Notably, while at the police station, Lim not only used crutches, but also moved at such a slow pace that motion-activated cameras failed to capture his entire path. From the comparative visual evidence of Lim's ease of movement in other contexts versus Lim's plodding path at the police station, Chief Milligan could reasonably conclude that not only had Lim exaggerated the degree of his debilitation, but also that the investigators' observations were credible. Indeed, Lim offers no explanation why he chose to use crutches during his May 22, 2019 visit to the police station.[11]

Nor was the evidence suggesting Lim engaged in workers' compensation fraud limited to his inconsistent use of crutches. The information Chief Milligan received from investigators included photographs of Lim carrying items, many of which appeared to be bulky and weigh more than five pounds, from his vehicle. Lim sometimes carried separate items in each hand, further supporting the investigators' report to Chief Milligan that Lim appeared to move without hesitation. Investigators also

---

[11] Lim declared, "[he] had been provided crutches at the onset of [his] injury; however, [his] doctor later instructed [him] to lessen [his] use of crutches in order to build strength in [his] leg. After that, [he] was only to use crutches when [his] pain increased and/or when [he] would be required to be on [his] feet for long periods of time." This statement is vague as to when his doctor so advised him.

provided Chief Milligan with evidence showing Lim standing on his toes and climbing an approximately 10 feet tall chain link fence.  In those photographs, Lim uses his arms to pull himself up the fence—an action inconsistent with his restriction not to pull more than five pounds.  Lim does not dispute that he carried any of the items in the photographs or climbed the fence, contend that any of these photographs are misleading, or offer any evidence that he did not carry or pull more than five pounds.  In fact, Lim does not address this evidence at all, and therefore fails to create a triable issue of material fact that City's proffered reason is pretextual.

Moreover, the chronology provided in the FD-1 report provided a comparison between what Lim was telling his doctors and his daily activities that could credibly give rise to further suspicions of workers' compensation fraud.  For example,

Yet,  on April 27, Lim climbed and jumped down from a chain link fence four times.

City's bases for believing Lim engaged in workers' compensation fraud were not limited to the fact that he selectively used crutches to exaggerate his condition and engaged in activities inconsistent with his medical restrictions; they further included believing that Lim was dishonest during his workers' compensation deposition.  For example, investigators stated that Lim sustained injuries to his lower back in 2011 from an automobile accident and demanded $25,000 for his injuries.  During his July 12, 2019 workers' compensation deposition, however, Lim claimed he did not suffer any pain or injuries as a result of the accident.  Further, when asked about his daily activities while on disability leave, he testified he did not believe he could climb a fence because of the pain he was experiencing,

27

and that other than taking his daughter to the park or painting classes, he stayed home and lay down eight hours a day, seven days a week. However, the investigators provided City with visual evidence that Lim participated in a basketball league, including hanging a banner on the chain link fence and carrying an LED sign out of a van. It is credible that this information would cause Chief Milligan to believe that Lim was dishonest during his workers' compensation deposition. Notably, Lim never offered an interpretation of this testimony that would create a triable issue as to the reasonableness of City's conclusion that he testified dishonestly. Nor did he ever dispute that making misrepresentations during his workers' compensation deposition would be sufficient grounds to discharge him from his probationary employment. Thus, Lim has not shown a triable issue that City's proffered reasons were "unworthy of credence."

(ii) *Satisfactory Job Performance*

Citing *Diego v. Pilgrim United Church of Christ* (2014) 231 Cal.App.4th 913, Lim argues that evidence of satisfactory job performance can demonstrate a triable issue of pretext precluding summary judgment. Although Lim raised the fact of his satisfactory performance in passing in his opposition and included it in his additional material facts, he did not argue it constituted evidence of pretext in the trial court. Lim makes this argument for the first time on appeal and, thus, we do not consider it. (*Sangster v. Paetkau, supra*, 68 Cal.App.4th at p. 163.)

Even if we did, Lim's evidence of satisfactory job performance does not create a triable issue. In *Diego v. Pilgrim United Church of Christ, supra*, 231 Cal.App.4th 913, the employer purported to terminate an employee for job

28

performance issues, namely " 'insubordination' and 'an insubordinate and hostile attitude,' as evidenced by her refusal to follow instructions to attend meetings." (*Id*. at p. 931.) Thus, evidence that over the 10 years of her employment, the employee had been promoted and had no record of any performance issues, including insubordination, was relevant to creating a triable issue. (*Id*. at p. 932.) Putting aside that the length of Lim's satisfactory performance was considerably shorter (a mere seven months, and less than halfway through his probationary period), City did not purport to terminate Lim for performance issues but for workers' compensation fraud. That Lim performed his ordinary job duties in a satisfactory fashion does not tend to prove that he did not engage in such fraud and, thus, is irrelevant to the issue of pretext.

(iii)    *Inadequate Investigation*

Lim next argues that City's investigation was inadequate for numerous reasons and that such inadequacy is evidence of pretext.

Quality of the Investigation:  First, Lim contends that City made no attempt to determine the qualifications of the investigators, verify the accuracy of the investigator's summaries, or compare Lim's medical restrictions against the results of the investigation.

Lim has not presented any authority that required City to determine the qualifications of an investigator hired by its insurer or independently verify the investigation's results through its own duplicative investigation. Nor has he adduced evidence demonstrating a triable issue that City should have been on notice to doubt the investigators' findings. To the contrary, when asked about the quality of the investigation, Chief

29

Milligan observed the investigators provided photographs. As described above, from these Chief Milligan could independently satisfy himself that the investigators were credible when they suggested Lim did not behave in a manner consistent with his work restrictions while he was temporarily totally disabled. Further, although Lim asserts that City never compared his medical restrictions against the results of the investigation, his argument ignores the other evidence, described *ante* in section B.2.b.(i), that tends to show Lim acted inconsistently with his work restrictions.

Failure to Interview Lim: Lim also argues the investigation was inadequate because City never interviewed him to get his side of the story. (See *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243 [reversing summary judgment in favor of the employer on a discrimination claim where the employer failed to interview five witnesses identified by the plaintiff who potentially had exculpatory information]; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95 [reversing summary judgment in favor of the employer on the plaintiff's retaliation claim where the employer did not interview two witnesses who gave exculpatory testimony in depositions].)[12]

City observes, however, that RJN's several-month investigation was indeed adequate even without interviewing Lim because RJN's investigation concerned whether Lim was presently engaging in workers' compensation fraud, not a

---

[12] Lim also relies on *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 to support this claim, but that case is inapposite as it involves considerations of investigative fairness where the employee cannot be discharged except for good cause. (*Id.* at pp. 106-107.)

reconstruction of what happened after the fact from witness statements. RJN's investigation included visual evidence of Lim's activities from which City could independently judge whether Lim's activities appeared to violate his work restrictions. Moreover, Lim had an opportunity during his workers' compensation deposition to describe his daily activities and offer any explanation of why those activities did not violate his work restrictions. Indeed, he was prompted to describe his daily physical activities several times but chose not to be forthcoming about those activities. Crucially for summary judgment purposes, Lim fails to offer any explanation or evidence why City should have come to any other conclusion but that he lied under oath, which itself was a basis for City's belief that Lim had engaged in workers' compensation fraud. Thus, Lim's evidence is insufficient to permit a rational inference of pretext. (See *Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 361.)

Failure to Watch "Exculpatory" Video: Lim argues City's investigation was inadequate because Chief Milligan failed to watch the "exculpatory" video concerning Lim's June 1, 2019 assistance to the individual who untangled the basketball net. We agree with the trial court that this evidence is not exculpatory. Although it confirms that Lim did not lift the man up to the net, it shows that he walked and shifted a chair backwards with his left hand with no visible difficulty. It also showed him supporting at least part of the weight of the man for 29 seconds on his own. Lim describes his support as "minimal," but this vague description does not create a triable issue because it does not actually conflict with City's conclusion that Lim engaged in an action equivalent to carrying more than five pounds, contrary to his work restrictions.

31

Premature Decision to Discharge Lim:  Lim next argues Chief Milligan prematurely decided to discharge him in April 2019, five months before RJN submitted the FD-1 report.  He observes that Chief Milligan declared, "Based upon what I had already seen and heard about [Lim's] physical activities [through April 2019], I believed there were already sufficient grounds for releasing [Lim] from his probationary employment."  This fails to create a triable issue.  Chief Milligan did not release Lim from his employment at that time.  Moreover, the record demonstrates that Chief Milligan considered additional information that the investigation uncovered through its conclusion, which happened to include more inculpatory evidence giving rise to an additional basis to suspect Lim of fraud, namely, his misrepresentations at his workers' compensation deposition.  Furthermore, Chief Milligan took another step before discharging Lim: he consulted legal counsel.  Thus, even if Chief Milligan believed there were grounds to discharge Lim as early as April 2019, the record does not demonstrate a triable issue that he failed to keep an open mind to consider what else the investigation revealed through its conclusion.

(iv)    *Temporal Proximity*

Lim argues that City's decision to terminate him as early as April 2019, three months after his work restrictions were imposed, creates a triable issue of pretext.  We disagree.  First, as discussed in the preceding paragraph, City did not actually terminate Lim in April 2019 and remained open to new information that the investigation revealed.  Second, temporal proximity between the employee's protected activity and the employer's adverse employment action can be used to establish pretext where there is other evidence to support the conclusion of

32

pretext. (See *Arteaga v. Brink's, Inc.*, *supra*, 163 Cal.App.4th at p. 353 ["temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination"].) Here, there is no other evidence that supports the conclusion of pretext.

Lim next argues, "At the latest, the undisputed facts show the City . . . made the decision to terminate on November 8, 2019, the day Lim returned from medical leave without restrictions." However, he does not develop this argument to explain how the concept of temporal proximity between the protected activity and adverse employment action applies in that scenario, especially when, as far as City knew, he was returning without any physical disability. Accordingly, we deem this argument forfeited. (See *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.)

(v) *Targeting Employee*

Lim notes that evidence suggesting the employer was seeking a reason to terminate an employee, such as soliciting negative information about the employee, can support a finding of pretext. (See *Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1062.) However, Lim does not provide evidence that City solicited negative information about him. Indeed, there is no evidence that City sought the original information that gave rise to the investigation in the first place. Lim observes that City "did not hide that they raced to terminate him in November 2019 before the end of his probation," at which time the termination process would have been costly. This does not show that City targeted Lim, and Lim has not demonstrated why City should

33

have delayed its decision under the circumstances until after Lim was no longer an at-will employee.

In sum, Lim has not demonstrated a triable issue that City's proffered reason for discharging him was pretextual. Accordingly, the trial court did not err in granting City's summary judgment motion as to Lim's causes of action for disability discrimination, retaliation, or—because it is dependent on showing discrimination or retaliation—City's failure to prevent discrimination or retaliation.

## C. Lim Has Not Raised a Triable Issue as to His Cause of Action for Failure to Accommodate

Under FEHA, it is unlawful "[f]or an employer . . . to fail to make reasonable accommodation for the known physical or mental disability of an . . . employee. Nothing in this subdivision . . . shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship, as defined in subdivision (u) of [s]ection 12926, to its operation." (§ 12940, subd. (m)(1).) "There are three elements to a failure to accommodate action: '(1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability. [Citation.]' [Citation.]" (*Hernandez v. Rancho Santiago Community College Dist.* (2018) 22 Cal.App.5th 1187, 1193-1194.)

In the trial court Lim argued, "[he] did not need a transfer accommodation. He needed a leave of absence accommodation." As part of its ruling, the trial court found Lim received the leave accommodation that he sought and, thus, there was no triable

34

issue as to his cause of action for failure to reasonably accommodate.

On appeal, Lim instead argues two new theories. First, he contends that while a leave of absence may be a reasonable accommodation, it is not reasonable when the leave leads directly to termination of employment as occurred in *Hernandez v. Rancho Santiago Community College Dist.*, *supra*, 22 Cal.App.5th 1187. Second, Lim argues City "failed to explore any potential job restructuring for the front desk position" or provide evidence that " 'contact with the general public' is an essential function of the position that would render Lim otherwise unqualified to do the job." We decline to consider Lim's new arguments on appeal. (*Sangster v. Paetkau*, *supra*, 68 Cal.App.4th at p. 163.)

Even if we did, we would conclude that *Hernandez*'s holding is inapplicable here and that Lim fails to demonstrate a triable issue that interaction with the public is not an essential function of a "front desk" position. In *Hernandez*, a probationary employee took leave so that she could undergo and recover from surgery necessitated by a work-place injury. The employer argued that based on the time she was away from work, it did not have sufficient time to evaluate her job performance before the conclusion of the probationary period. Rather than make her a permanent employee, it terminated her employment. The appellate court held the employer failed to reasonably accommodate the employee, concluding "a finite leave is not a reasonable accommodation when the leave leads directly to termination of employment because the employee's performance could not be evaluated while she was on the leave." (*Hernandez v. Rancho Santiago Community College Dist.*, *supra*, 22 Cal.App.5th at p. 1194.) The employer's collective bargaining

35

agreement did "not speak to deducting leaves of absence from ' "total service," ' " which permitted the employer to extend the probationary period by the time the employee was away due to her work-related injury. (*Id.* at pp. 1195-1196, fn. omitted.) In this way, the employer could have avoided the alleged undue hardship of making her a permanent employee "without [the] benefit of having had her job performance evaluated." (*Id.* at p. 1196.) Unlike *Hernandez*, there is no evidence that City discharged Lim because his leave of absence prevented City from adequately evaluating Lim's job performance.

Second, the phrase "front desk" is commonly understood as DPD described the position: the desk in a building where the public is greeted. (Merriam-Webster's Collegiate Dictionary, https://unabridged.merriam-webster.com/collegiate/front%20desk <as of June 26, 2024>; Oxford English Dictionary, https://www.oed.com/dictionary/front-desk_n?tab=meaning_and_use#1378022870100 <as of June 26, 2024>.) Lim offers nothing to suggest that the common understanding of the phrase "front desk" is not applicable here. Further, the law did not require City to create a new position to accommodate Lim. (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1224.) Accordingly, Lim did not demonstrate a triable issue that City should have accommodated him in some fashion other than to continue his disability leave.

## D. Lim Has Not Raised a Triable Issue as to His Cause of Action for Failure to Participate in the Interactive Process

FEHA makes it unlawful for an employer to fail to engage in a timely, good faith interactive process with the employee to determine effective reasonable accommodations. (§ 12940, subd.

(n).) "[I]n order to succeed on a cause of action for failure to engage in an interactive process, 'an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred.' [Citations.]" (*Shirvanyan v. Los Angeles Community College Dist.* (2020) 59 Cal.App.5th 82, 96.)

Lim argues a triable issue of fact exists as to whether City conducted its interactive process in good faith. He contends there is no evidence that City made any effort in September 2019 to determine whether there were positions available that could accommodate his work restrictions. However, as Lim argued in the trial court, the only accommodation he sought was leave accommodation. Lim did not identify any other reasonable accommodation that he claimed should have been provided to him. Lim does not dispute that in September 2019, City continued his temporary total disability leave. Thus, Lim failed to demonstrate a triable issue that City failed to engage in the interactive process.

## DISPOSITION

The judgment is affirmed. City is awarded its costs on appeal.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.